**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ERIC W. PAYNE** | ) | |
| **9874 High Water Court** | ) | |
| **Burke, Virginia  22015** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 10cv0679** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DISTRICT OF COLUMBIA,** | ) | |
| **A Municipal Corporation** | ) | |
| **Serve:  Adrian Fenty** | ) | |
| **John A. Wilson Bldg.** | ) | |
| **1350 Pennsylvania Ave., NW** | ) | |
| **Washington, D.C.** | ) | |
| | ) | |
| **Office of the Attorney General** | ) | |
| **441 4th Street, NW** | ) | |
| **6th Floor** | ) | |
| **Washington, DC 20001** | ) | |
| | ) | |
| **Natwar Ghandi** | ) | |
| **Chief Financial Officer** | ) | |
| **District of Columbia** | ) | |
| **1350 Pennsylvania Ave. NW** | ) | |
| **Suite 203** | ) | |
| **Washington, D.C.  20004** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## <u>COMPLAINT</u>

**COMES NOW PLAINTIFF,** Eric W. Payne, by and through undersigned

counsel, and respectfully files this civil action against the above captioned Defendants on

the following grounds: 1) violation of Plaintiff's Fifth Amendment rights and

constitutional defamation; 2) retaliation in violation of District of Columbia False Claims

1

Act; 3) violation of the District of Columbia Whistle Blower Act; and 4) Wrongful Discharge public policy exception.

## JURISDICTION AND VENUE

**1.**        Jurisdiction in this case is based upon 42 U.S.C. §1983, 28 U.S.C. §§1332(a) and 1343(a)(3) and 28 U.S.C. §1367, as to supplemental jurisdiction over the pendent state law claims.  Venue in this case is based upon 28 U.S.C. §1343(a)(3), as the incidents which give rise to this case occurred in the District of Columbia.  Plaintiff has timely filed notice upon the District consistent with D.C. Code § 12-309.

## PARTIES

**2.**        Plaintiff, Eric W. Payne ("Payne"), is a former District of Columbia ("D.C.") Contracting Officer and served as Director of Contracts for the Office of the Chief Financial Officer ("OCFO"), an independent agency within the District of Columbia.  Plaintiff, a resident of the State of Virginia, is also an attorney, licensed to practice law in multiple jurisdictions.

**3.**        Defendant, District of Columbia (Office of the Chief Financial Officer), is a municipal entity.  The Office of the Chief Financial Officer ("OCFO") is responsible, inter alia, for the supervision and operation of the procurement process for the D.C. Lottery and Charitable Games Board ("D.C. Lottery" or "DCLB").

**4.**        Defendant Natwar Gandhi ("Gandhi") is the Chief Financial Officer ("CFO") and the titular head of OCFO.

## FACTS COMMON TO ALL COUNTS

### THE BEGINNING YEARS: 2004-2006

**5.**   Plaintiff began his career with the OCFO as an Assistant General Counsel in or around August 2004.   In this role, he was responsible for advising, reviewing and opining on the legal sufficiency of all OCFO procurement related actions, including contracts submitted for D.C. Council review and approval.   The Office of Contracts for the OCFO was responsible for all acquisition, procurement and termination activities within the OCFO.

**6.**   In October 2004, Plaintiff received the highest rating possible in his performance evaluation − 5.0/5.0 "Significantly Exceeds Expectations."  He became a highly trusted adviser on all procurement and acquisition matters within the OCFO and was given increasing responsibility and authority.  In June 2005, after the departure of the then Director of Contracts, Plaintiff was asked to "temporarily" fill this vacancy.

**7.**   Plaintiff served as both the Acting Director of Contracts and Assistant General Counsel until March 2006, when he was encouraged to apply for the permanent Director of Contracts position.

**8.**   During this "temporary" period, Plaintiff met individually with the CFO and other senior members of his staff in order to seek individual assurances that the CFO and its senior management were committed to reforming procurement practices and that they would support Plaintiff's attempts to enforce the rules and requirements for all staff, personnel and vendors. Plaintiff received such assurances without equivocation.

9.    Plaintiff, at that time, was increasingly involved in high-level meetings with the CFO, his senior staff, elected and appointed District leaders, vendors and others on high profile issues affecting the OCFO. One such example was the unprecedented security breach of the D.C. Lottery, which began in 2005.

### Sixth Director of Contracts for the OCFO since 2003

10.    On May 11, 2006, Plaintiff became the Sixth Director of Contracts for the OCFO within a two and one half-year span.

11.   Prior to Plaintiff's appointment, the OCFO had been plagued by constant turnover within the Office of Contracts and, on an annual basis, it had been the subject of negative audit findings and even less flattering reporting on OCFO related contract mishaps.

12.    Prior to starting as the new Director of Contracts, Plaintiff received an annual performance evaluation score of 4.538/5.0 for FY 2005, which placed him in the top percentile of performers within the OCFO.  His overall score placed him in the "5" category – "Significantly Exceeds Expectations."  Along with this stellar rating came an annual performance bonus in the form of a monetary award.

13.   In December 2006, Plaintiff served as an appointed member of the D.C. Procurement Reform Task Force.  He was also asked to represent the OCFO in crafting a response to an independent review of District procurement practices conducted by the Federal Government Accountability Office ("GAO"), which reviewed and issued a report on the procurement practices in D.C.

**14.**    Both entities concluded (1) that there was a lack of transparency in D.C. procurements; (2) that the rules/procedures were often ignored/not followed; (3) that procurement is dysfunctional in D.C. and that the critical problem is the failure to establish a climate of ***compliance and enforcement of controls that ensure compliance with the existing procurement regulation system***; and (4) that the problems in the procurement system are not as much its laws, regulations, and implementing procedures, as is the D.C. government's commitment to follow and adhere to these laws and rules.

**15.**    As Plaintiff would soon discover, neither he nor these entities knew how extensive, systemic and endemic these issues remained in the District.    When it came to the D.C. Lottery contract, the CFO, among others, viewed internal controls, rules, and regulations as optional and secondary to political considerations.

**16.**    In addition to the D.C. Procurement Reform Task Force and the GAO response team, Plaintiff was also selected to serve as an OCFO representative on the City Administrator's internal procurement reform team.  Lastly, Plaintiff was asked to serve as the OCFO's representative on the District's Debarment and Suspension Panel, a panel empowered to review alleged bad acts by individuals or companies.

**17.** On December 2, 2006, Plaintiff received a performance evaluation from his new supervisor, Paul Lundquist, Executive Director of the Office of Management and Administration ("OMA").  His evaluation score was 4.0/5.0 – "Exceeds Expectations," which resulted in an annual performance bonus, a monetary award. Prior to this performance rating, Plaintiff received a Special Act Award for outstanding achievement and contributions to the OCFO.

### *LTE Contract – Security Breach*

**18.** In late 2005 and early 2006, there were a series of security breaches that occurred involving the D.C. Lottery and the printing of fraudulent lottery tickets. Plaintiff was asked to assist the CFO in crafting a response to each security issue and to take appropriate actions related to Lottery Technology Enterprise's ("LTE's") potential liability for the aforementioned actions.

**19.** Beginning in December 2005, numerous DCLB gaming retailers began to complain that their weekly DCLB assessments exceeded their retail sales figures. The DCLB made several written inquiries to LTE and GTECH to review these retailer complaints and determine their authenticity and veracity. On each occasion, the DCLB was told that the complaints were unfounded, the network was secure and the retailer complaints were without foundation.

**20.** When the complaints persisted, the DCLB opted to hire an independent firm, Battelle Memorial Institute ("Battelle"), to review the gaming system and retailer complaints. Battelle determined that a security flaw existed in the gaming system that allowed rogue operators to fraudulently print "winning" lottery tickets and claim monetary prizes, an unprecedented fraud in the U.S. Lottery system.

**21.** Following these security breaches, Dr. Gandhi instructed Plaintiff to terminate the contract with LTE and specifically stated that he wanted to have this contract end "as quickly as possible."

6

*New Lottery Contract*

**22.** By September/October 2006, rather than abruptly terminate LTE, Plaintiff convinced the CFO to expedite the procurement for a new lottery contractor and to award a new contract as quickly as possible.

**23.** The CFO made it clear to Plaintiff and senior staff, in multiple conversations, that he had lost confidence in LTE to provide lottery related services.  His expressed directive was that LTE was not to be selected as the vendor for the new contract award.

*Issuance of New Gaming System RFP*

**24.** Plaintiff refused to follow the CFO's directive and informed him that he could not legally pre-determine this contract award and that the decision would have to be based on the merits as delineated in the Request for Proposals ("RFP").

**25.** On May 23, 2007, CFO authorized issuance of an RFP for a new gaming system network and platform, Solicitation No. CFOPD-07-R-053.   Responses were ultimately due September 20, 2007.   Plaintiff contemplated awarding a fixed-priced contract, in which the selected contractor would be paid an annual fee, based on DCLB sales.  Moreover, the RFP required that any contractor selected would be responsible for installing a new gaming system and platform and that this conversion from the current system and platform would last a maximum of eighteen (18) months.  The RFP required that the conversion period be completed no later than November 22, 2009, the expiration date of the LTE contract.

26.    Following the September 20, 2007 closing date of the RFP, two proposals were received, LTE and W2I.   LTE, the incumbent, was a joint venture comprised of New Tech Games, Inc., Opportunity Systems, Inc., and GTECH Corporation.  W2I, the other offeror, was a joint venture comprised of W2Tech, LLC and Intralot.

27.    The Source Selection Evaluation process was completed in January 2008.    In accordance with the legal procurement standard, an independent panel of subject matter experts within the OCFO—the Source Selection Evaluation Board ("SSEB")—concluded that the price and technical offering of W2I was most advantageous for the District.  This decision was reviewed and approved by Battelle.

28. Plaintiff, as Contracting Officer, conducted an independent review and evaluation of each of the proposals and concluded that W2I offered a technically superior proposal saving the District more than $40,000,000 over the next 10 years over the current LTE contract.

29. Plaintiff made the CFO and other senior staff aware of the solicitation process results in January 2008 and formally issued a contract award decision thereafter.  For reasons unbeknownst to Plaintiff, the CFO failed to act on the award decision until April 2008.  This delay was highly unusual and had not occurred heretofore in Plaintiff's tenure.

30. In the interim, the CFO's General Counsel informed Plaintiff that the contract would be approved by utilizing a D.C. Council process in contravention of the law.  Plaintiff expressed his concerns about this irregular process to his supervisor and

senior OCFO staff.

**31.** In late March 2008, Plaintiff was informed he would be required to testify before the D.C. Council regarding this contract.  During the April 7, 2008 hearing, Council members repeatedly attempted to challenge the procurement process.  It was clear that certain Council members opposed the proposed contract because of the involvement of W2Tech.

**32.** Plaintiff was also informed that LTE had filed a bid protest with the D.C. Contract Appeals Board ("CAB").  Broadly speaking, LTE argued that it was treated unfairly during the procurement process and that the award decision was unreasonable. Several Council members took the unusual position of wanting to await the outcome of the CAB's judicial review of the procurement process before approving the proposed contract award.

**33.** Following the above referenced City Council hearing and repeatedly thereafter, the CFO, Director of Operations, Chief of Staff, and OMA Executive Director strongly cajoled Plaintiff to either reconsider his award decision or to cancel the proposed contract award and re-open the solicitation process.  Plaintiff repeatedly advised all parties there was no legal basis for either action.

### *The Chain of Retaliation*

**34.** On April 9, 2008, Plaintiff met with OCFO program officials regarding OCFO Information Technology ("IT") contracts.  During the course of this meeting, an egregious instance of contractor fraud was brought to Plaintiff and Lundquist's attention. Following the meeting, they met and mutually agreed that Plaintiff should take the

9

unprecedented step of reporting his concerns to the Office of Integrity and Oversight ("OIO"), the OCFO's internal security arm.   Plaintiff and his supervisor believed that OCFO's management intentionally circumvented District's contract procurement rules and regulations, and failed to prevent waste and fraudulent practices.

**35.** On April 15, 2008, following the CFO's weekly senior staff meeting, Plaintiff's supervisor reported to Plaintiff that he had been singled out by the CFO for the commendatory handling of the D.C. Lottery procurement and Plaintiff's D.C. Council testimony on April 7 and April 9, 2008.

**36.** On April 17, 2008, upon information and belief, the then new director of OIO had a breakfast meeting with the CFO and reported Plaintiff's complaint to the CFO, thereby disclosing the fact of the investigation and illegally disclosing the identity of the complainant (Plaintiff).   This was a turning point in the relationship between the CFO and Plaintiff.   On the afternoon of April 17, 2008, the CFO met with Plaintiff's immediate supervisor, Lundquist, and Lundquist's supervisor Angell Jacobs ("Jacobs") and instructed both that Plaintiff's tenure within the OCFO needed to end as soon as practicable.   Plaintiff met with both Lundquist and Jacobs thereafter and was told that the CFO wanted Plaintiff to leave the organization.   Both Lundquist and Jacobs expressed their desire for the CFO to reconsider Plaintiff's position.

**37.** As a result of Plaintiff reporting the matter to the OIO Director, a retaliatory complaint was lodged against him by the CFO's General Counsel, on behalf of the CFO, in late April or early May of 2008.   Plaintiff was further informed by the investigating agent, who was also the agent responsible for investigating his reported IT concerns, that

this retaliatory complaint was a "high priority investigation."   The OIO Director determined that the complaint was unsubstantiated and Plaintiff's integrity was unquestioned.

**38.** To date, Plaintiff's initial OIO complaints have yet to be adequately investigated, reviewed or resolved.

**39.** In May 2008, after Plaintiff was targeted for the aforementioned retaliatory investigation by OIO, he informed Lundquist that he intended to report the matter to the District of Columbia's Office of Inspector General ("OIG").  Lundquist agreed that going to OIG "needed to be done for the long-term good of the OCFO," and that no one else in the OCFO needed to be informed of this action, including the CFO or other senior staff.

**41.** Accordingly, Plaintiff reported to the OIG's audit and investigative representatives his concerns about procurement improprieties and the pressure that the CFO was applying to him relative to the D.C. Lottery contract.   An investigation case was opened and assigned to a Special Agent.  Plaintiff was also informed that the audit division would conduct a parallel review of OCFO procurements.

**42.** Shortly after Plaintiff's discussion with OIG, it became apparent that others in the OCFO were aware of his presumably confidential request for an OIG investigation. Plaintiff's relationship with the Director of Operations and Lundquist thereafter changed dramatically.

**43.** On or about May 2, 2008, Plaintiff met with Gandhi, a senior elected official, and other CFO personnel to discuss the lottery contract.  In this meeting, Plaintiff was expressly asked if he could "get rid of Warren Williams Jr. (the minority partner of

11

Intralot) and replace him with Leonard Manning (the minority partner of GTECH)."
Both Plaintiff and the Acting Executive Director of the Lottery, stated again it was
legally impermissible to alter the contract selection and award process.

**44.** Gandhi nevertheless pressured Plaintiff to do so. Upon information and belief,
numerous calls were made to Gandhi regarding the selection of Intralot and W2Tech as
the Lottery contractor.

**45.** On May 5, 2008, Plaintiff once again met with Dr Gandhi, and at least one
elected official to discuss the Lottery contract.  That Councilmember refused to discuss
the issue and said it would not be on the upcoming council agenda, nor would the
Council vote on the proposed contract.

**46.** Thereafter, Defendant Gandhi summoned Plaintiff into a meeting with other
senior CFO personnel and once again cajoled Plaintiff to cancel the RFP and reopen the
process.  Plaintiff once again advised the CFO that there was no legal basis to do so and
cancellation was legally impermissible.

**47.** Upon information and belief, the CFO had committed to certain City
Councilmembers and other politically connected individuals to terminate Plaintiff and re-
bid the lottery contract.

**48.**  On June 12, 2008, Plaintiff met with an OIO investigator whereupon much to
his shock and dismay, he was informed that a criminal probe had been launched against
him.  This clearly threatening, intimidating and retaliatory action extremely demoralized
Plaintiff and caused him great fear and concern for himself, his employment and the
welfare of his family.   Invariably, Plaintiff knew that this was the consequence for his

refusal to acquiesce to the above referenced demands and to "play ball" in a corrupt procurement environment.

**49.** Following the June 12, 2008 meeting, Plaintiff met with the OIO Director who stated therein that he reported Plaintiff's April 2008 investigative request to Gandhi. At this point, Plaintiff realized that OIO's independence and integrity had been compromised relative to waste, fraud, and abuse in contract matters.

**50**. Lundquist then encouraged Plaintiff to begin searching for new employment.

**51.** On June 27, 2008, Plaintiff had a second meeting with the OIO Director regarding yet another retaliative investigation of Plaintiff. This investigation was allegedly initiated by a City Councilmember who opposed the involvement of W2Tech in the D.C. Lottery contract. No negative finding was made, nor was the complaint substantiated.

**52.** On July 7, 2008, Plaintiff met with Lundquist and Jacobs to discuss "performance challenges" in the Office of Contracts.

**53.** In July 2008, Lundquist advised Plaintiff that he had the freedom to "look for another job," but henceforth, all staff would report to the Deputy Director.  Moreover, Lundquist informed Plaintiff that he would be required to vacate his office and would be given the title of "Senior Advisor," internally, but externally, Plaintiff would remain the Contracting Officer for the online gaming system and platform procurement.  Despite being stripped of his role and authority, Plaintiff remained the public face and target for proponents of LTE's contract.

**54.** In mid-July 2008, Plaintiff was compelled to assess and issue long-standing liquidated damages letters to LTE.  While the assessments were valid under the contract, Plaintiff questioned the commitment of the OCFO to collect the assessed damages and the passage of time that had occurred since the first infraction in March 2007.

**55.** In December 2007, the CFO opted not to terminate LTE's contract, nor to pursue liquidated damage settlement discussions with LTE for the security breach.

**56.** Aside from low-level administrative items and issuing the liquidated damages letters, Plaintiff had no meaningful tasks.  Plaintiff was instructed that he would remain Contracting Officer for the new lottery contract, but he would not be responsible for any other OCFO contract matters.

**57.** In October 2008, following Plaintiff's attempts to negotiate resolution (i.e. payment) of the damages assessed to LTE, Plaintiff received a directive from the CFO's General Counsel directing him to cease all direct contact and communications with LTE, despite Plaintiff's position as contracting officer.  Instead, the General Counsel informed Plaintiff that all communications would flow through him.

**58.** Ironically, as Plaintiff was being continuously marginalized and isolated within the OCFO for his failure to participate in suspect procurement actions, the CAB ruled on the LTE Protest.  It determined that the procurement process for the D.C. Lottery contract was fair, reasonable and objective.  Plaintiff's award decision was upheld and LTE's Protest was dismissed in part and denied in part.

**59.** Despite an independent judicial review and approval of the procurement process, the D.C. Council still resisted voting on the proposed contract.  It was only after negative newspaper articles questioning the Council's position that the Council finally agreed to vote on the proposed contract on or about December 16, 2008.  The Council disapproved the contract.  Plaintiff was not allowed to manage the re-procurement process.

**60.** On December 29, 2008, Lundquist directed Plaintiff to review two (2) contract files. Plaintiff was advised that auditors were scheduled to review these files, that the files had been reviewed internally, and that several problems existed within the files.

**61.** Plaintiff was asked to take "appropriate action" to rectify the contracts, to wit, to execute his signature on documents *ex post facto* the date of the actual contract awards. The contract files contained unsigned documents with sticky notes that said "sign here" and "date 9/1/07" or "8/15/08".  In other words, the contracts appeared to have been awarded without proper authority.

**62.** Plaintiff reviewed the files to see if any contained his customary redlined notes, which provided guidance for subordinate staff (i.e. the contract specialist).   They did not.

**63.** Plaintiff inquired as to why the contract specialist or program official was not reviewing the files.  No response was given.

**64.** After Plaintiff completed his review, noting that no further action could be taken including his *ex post facto* execution of the contracts, Lundquist once again gave

Plaintiff the files and directed him to "review" them.   Plaintiff once again reiterated that there was nothing more that he would do or felt comfortable doing.   Lundquist asked Plaintiff a third time to review these files.   Lundquist's repeated requests for Plaintiff to review these unsigned contracts intimated that Plaintiff should sign and backdate each contract. Plaintiff refused noting that such signatures after the fact of the contract were illegal.

### *Termination of Plaintiff*

**65.** On January 8, 2009, Plaintiff received an email request to meet with Lundquist on January 9, 2009 to discuss his performance evaluation.   Plaintiff's numeric score was a 3.89/5.0, Exceeds Expectations.

**66.** Plaintiff had not received an evaluation for FY 2007 until May 22, 2008, during which he received a numeric score only.   He did not receive any written comments supporting this score, which was highly unusual, until November or December 2008. During the January 9, 2009 meeting, Plaintiff was told that his services were no longer needed and that he was going to be terminated, effective immediately.   Plaintiff was given a week to consider a settlement package.   No reason was given for the termination.

**67.** The Human Resources ("HR") Director, subsequently joined by two armed security guards, the deputy HR director, the deputy Logistics director, Lundquist and his assistant, stood prominently and publicly in Plaintiff's small office and supervised his removal.   The entire office observed this public and disgraceful act of humiliation. Finally, Defendants achieved their ultimate objective.   Within one hour of his dismissal, Plaintiff now totally embarrassed and dehumanized, loaded the few items that he was

allowed to take into his vehicle and left the government.

**68.** After Plaintiff's termination, Defendant D.C. OCFO has made several defamatory statements about Plaintiff to the public through major area newspapers.  On April 20, 2009, in a Washington Post article, David Umansky, CFO spokesman, disputed that any investigation of Plaintiff was requested.   He further stated that, "No member of the [C]ouncil or the mayor's office discussed with Dr. Gandhi who should get the contract and no pressure was applied by either."   Umansky's statement was false and effectively stated that Plaintiff has lied about these facts.

**69.** These statements impugned Plaintiff's reputation and marketability in the work place.

**70.** Since his termination, Plaintiff has been unable to secure permanent employment in his chosen profession of law and government procurement.

**71.** At all times herein, Defendant asserts *respondeat superior* and further asserts malice and ill will.

<u>**COUNT I**</u>
**CONSTITUTIONAL DEFAMATION**
**VIOLATION OF FIFTH AMENDMENT LIBERTY INTEREST**
**42 U.S.C. SECTION 1983**

**72.** Plaintiff hereby incorporates by reference paragraphs 1 through 71 as if fully set forth herein.

**73.** Defendant's termination of Plaintiff and the publicity attached thereto, including but not limited to the OCFO's comments in the Washington Post, suggested that Plaintiff was dishonest, a liar and  terminated for reasons related to performance.

17

**74.** Further, the CFO's statements made in the Washington Post impugned Plaintiff's professional competence and reputation and placed a significant roadblock on his ability to obtain permanent full time employment in his chosen field of contract procurement law.

**75.** Alternatively, said actions created a stigma that foreclosed Plaintiff's freedom to take advantage of other employment opportunities, including pursuing employment in his chosen field as an attorney interested in government procurement.

**76.** Defendant's termination and public chastisement substantially reduced the value of Plaintiff's human capital and his professional opportunities.

**77.** As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer from injury to his liberty interest under the Fifth Amendment, including embarrassment, humiliation, mental anguish and loss of reputation.

**WHEREFORE**, Plaintiff seeks judgment against the District of Columbia and Defendant CFO as follows:

(a) Compensatory damages in the exact amount to be determined at trial, but in no event less than $5,000,000;

(b) Punitive damages, if appropriate, in an exact amount to be determined at trial, but in no event less than $1,000,000;

(c) Attorney's fees and costs; and

(d) Such further relief as this Honorable Court deems just and fair.

**COUNT II**
**D.C. FALSE CLAIM ACT**
**D.C. Code §2-308.16**
**(Retaliative Termination)**

**78.** Plaintiff incorporates the allegations in paragraphs 1 through 77 as if fully set forth herein.

**79.** Pursuant to the D.C. False Claims Act, Defendants are prohibited *inter alia* from discharging, demoting, suspending, harassing, denying promotion or in any manner discriminating against an employee because of a lawful act done in disclosing corruption.

**80.** Plaintiff engaged in a protected activity by reporting waste and fraud to his supervisor, Office of Integrity and Oversight, the D.C. Office of Inspector General and other senior District officials and by refusing to comply with an illegal order.

**81.** Defendants continuously violated the above referenced Act and its violations culminated in Plaintiff's termination.

**82.** Defendants illegally terminated Plaintiff based upon Plaintiff's exercise of a protected activity under the statue.

**83.** As a consequence of Defendants' termination and other actions, Plaintiff suffered significant economic and emotional damages.

**WHEREFORE,** Plaintiff seeks judgment against Defendants jointly and severally as follows:

(a) Compensatory damages for extreme embarrassment, humiliation and mental anguish for an amount in excess of $10,000,000 and statutory damages;

(b) Cost of this suit, including reasonable attorney's fees; and

(c) Such other and further relied that this Court deem just and proper.

19

**COUNT III**
**DC WHISTLE BLOWER ACT**
**D.C. CODE SECTION 1-615-51 et seq.**

**84.** Plaintiff adopts and incorporates the allegations of paragraphs 1 through 83 as if fully set forth herein.

**85**. Pursuant to the D.C. Whistle Blower Act, Defendants are prohibited from reassigning, terminating or otherwise retaliating against a D.C. government employee as a result of that employee's protected disclosures that the employee reasonably believes show gross mismanagement, gross misuse or waste of government resources, and abuse of authority in the connection with the administration of a government program, or a violation of a state, local or federal law, rule or regulation.

**86**. Plaintiff is an employee who, as a result of his disclosures to his supervisor, Office of Integrity and Oversight, the D.C. Office of Inspector General and other senior District officials about abuse of authority, potential corruption, ethics violations, potential illegal contract procurement decisions,  and his refusal to comply with an illegal order, enjoyed the protection of DCWPA.

**87.** As a direct result of Plaintiff's protected disclosures, Defendants gradually, and continuously retaliated against Plaintiff, including but not limited to public reprimands of Plaintiff, demotion, reassignment of Plaintiff to lesser duties, relocation of his office, isolation, and ultimately termination.

 **88.**    As a result of Defendants' actions, Plaintiff suffered significant economic harm in the form of loss employment, corresponding salary, loss employment opportunities, damage to his professional reputation, and significant mental and

emotional distress.

**WHEREFORE**, Plaintiff seeks judgment against the Defendants jointly and severally as follows:

> (a) Compensatory damages in the exact amount to be determined at trial, but in no event less than $10,000,000 and statutory damages;

> (b) Punitive damages, if appropriate, in an exact amount to be determined at trial;

> (c) Attorneys fees and costs; and

> (d) Such further relief as this Honorable Court deems just and fair.

## COUNT IV
### WRONGFUL TERMINATION AGAINST PUBLIC POLICY

**89.** Plaintiff adopts and incorporates the allegation of complaint paragraphs 1-88 as if fully set forth herein.

**90.**  Defendants urged Plaintiff to perform certain actions.

**91.** Plaintiff refused to set aside, cancel or modify a D.C. lottery contract award, which was selected consistent with established criteria and procedures and Plaintiff refused to execute contracts *ex post facto* their award dates.

**92.** As a result of the aforementioned actions, Defendants terminated Plaintiff in violation of public policy in the District of Columbia.

**93.** As a result of Defendants' actions, Plaintiff has suffered significant economic harm in the form of loss of employment, corresponding salary and benefits, loss of employment opportunities, damage to his professional reputation, and significant mental and emotional distress.

**WHEREFORE**, Plaintiff requests that this Court grant the following relief:

(a)  An award of compensatory damages for the extreme embarrassment, humiliation and mental anguish which he was caused to endure in an exact amount to be determined at the trial of this matter but in no event less than $5,000,000;

(b)  Award Plaintiff the cost of this suit, including reasonable attorney's fees; and

(c)  Such other and further relied that this Court deem just and proper.

Plaintiff demands a trial by jury on all issues so triable.

<u>**COUNT IV**</u>
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**94.** Plaintiff adopts and incorporates the allegation of complaint paragraphs 1-93 as if fully set forth herein.

**95.** At all times referenced herein, Defendants intentionally and/or recklessly employed aggressive and systemic efforts to harm and injure Plaintiff including the launching of criminal investigations to destroy his reputation, and to impede his efforts and opportunities such that Defendants' efforts were extreme and outrageous.

**96.**  Defendants' actions exceed traditional employer-employee conflicts and have caused Plaintiff severe emotional distress and anguish.

**WHEREFORE**, Plaintiff requests that this Court grant the following relief:

(a) An award of compensatory damages for the extreme embarrassment, humiliation and mental anguish which he was caused to endure in an exact amount to be determined at the trial of this matter but in no event less than $5,000,000;

(b)  Award Plaintiff the cost of this suit, including reasonable attorney's fees; and

(c) Such other and further relied that this Court deem just and proper.

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

*Donald M. Temple*

Donald M. Temple, Esq.
1229 15th Street, N.W.
Washington, D.C. 20005
Tel: (202) 628-1101
Fax : (202) 628-1149
Email : dtemplelaw@gmail.com