UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
ERIC W. PAYNE,                            )
                                          )
        Plaintiff,                        )
                                          )
        v.                                )        Civil Action No. 10-0679 (PLF)
                                          )
DISTRICT OF COLUMBIA, et al.,             )
                                          )
        Defendants.                       )
_____ )

OPINION

        This matter is before the Court on defendants' motion to dismiss and plaintiff's

motion for leave to file a second amended complaint.  The Court heard oral argument on these

two motions on March 25, 2011, and took them under advisement.  Upon review of the parties'

papers, the oral arguments presented by counsel, the relevant legal authorities, and the entire

record in this case, the Court will grant in part and deny in part defendants' motion to dismiss

and will deny plaintiff's motion for leave to file a second amended complaint.[1]

I.  BACKGROUND

        The District of Columbia Office of the Chief Financial Officer ("OCFO") is

"responsible . . . for the supervision and operation of the procurement process for the D.C.

_____

        [1]        The papers reviewed in connection with the pending motions include: plaintiff's
amended complaint ("Am. Compl."); defendants' motion to dismiss ("Mot."); plaintiff's
opposition to defendant's motion to dismiss ("Opp."); defendants' reply to plaintiff's opposition
to their motion to dismiss ("Reply"); plaintiff's motion for leave to file a second amended
complaint ("Mot. for Leave"); plaintiff's proffered second amended complaint; and defendants'
response to plaintiff's motion for leave to amend ("Opp. to Mot. for Leave").

Lottery and Charitable Games Board . . . ." Am. Compl. ¶ 3. Plaintiff Eric W. Payne began his

career with the OCFO as an Assistant General Counsel in August 2004. Id. ¶ 5. Subsequently,

in May 2006, Mr. Payne became the Director of Contracts for the OFCO. Id. ¶ 10. Then, in

December 2006, Mr. Payne was appointed as a member of the District of Columbia Procurement

Reform Task Force and "was also asked to represent the OCFO in crafting a response to an

independent review of District procurement practices conducted by the Federal Government

Accountability Office . . . ." Id. ¶ 13. As an Assistant General Counsel and then as the Director

of Contracts, Mr. Payne "was responsible for advising, reviewing and opining on the legal

sufficiency of all OCFO procurement related actions, including contracts submitted for D.C.

Council review and approval." Id. ¶ 5.

       As Mr. Payne describes, in late 2005 and early 2006, "there were a series of

security breaches that occurred involving the D.C. Lottery and the printing of fraudulent lottery

tickets." Am. Compl. ¶ 18. Mr. Payne was asked to assist defendant Dr. Natwar Gandhi, the

District's Chief Financial Officer, "in crafting a response to each security issue" and to take

appropriate action with respect to the contractor supplying the operating system, Lottery

Technology Enterprises ("LTE"). Id. A subsequent investigation by an independent firm

uncovered a security flaw in the system that allowed fraudulent lottery tickets to be printed. Id.

¶ 20. "Following these security breaches, Dr. Gandhi instructed [Mr. Payne] to terminate the

contract with LTE and specifically stated that he wanted to have this contract end 'as quickly as

possible.'" Id. ¶ 21.

       Mr. Payne then began the procurement process for a new lottery contract. See

Am. Compl. ¶¶ 22, 24. According to Mr. Payne, Dr. Gandhi expressly directed him not to select

LTE as the vendor for the new contract.  Id. ¶ 23.  Mr. Payne, however, "refused to follow the CFO's directive and informed him that he could not legally pre-determine th[e] contract award and that the decision would have to be based on the merits as delineated in the Request for Proposals . . . ."  Id. ¶ 24.

After the contract bidding ended on September 20, 2007, the District received two contract bids, one from LTE and another from W2I.  Am. Compl. ¶ 26.  "LTE, the incumbent, was a joint venture comprised of New Tech Games, Inc., Opportunity Systems, Inc., and GTECH Corporation.  W2I, the other offeror, was a joint venture comprised of W2Tech, LLC and Intralot."  Id.  An independent panel within the OCFO examined these two bids and concluded that the W2I offer "was the most advantageous for the District."  Id. ¶ 27.  Mr. Payne then conducted an independent review and concluded that "W2I offered a technically superior proposal saving the District more than $40,000,000 over the next 10 years over the current LTE contract."  Id. ¶ 28.  Mr. Payne informed Dr. Gandhi and other senior staff of the solicitation results in January 2008 and "formally issued a contract award decision [to W2I] thereafter."  Id. ¶ 29.

Subsequently, Mr. Payne alleges, Dr. Gandhi's General Counsel informed Mr. Payne that the contract "would be approved by utilizing a D.C. Council process in contravention of the law."  Am. Compl. ¶ 30.  It later appeared clear to Mr. Payne that certain D.C. Councilmembers were opposed to the proposed contract because of the involvement of W2Tech. Id. ¶ 31.  And, according to Mr. Payne, various senior staff, including Dr. Gandhi, subsequently instructed Mr. Payne "to either reconsider his award decision or to cancel the proposed contract award and re-open the solicitation process."  Id. ¶ 33.  Mr. Payne says that he repeatedly advised

all parties that there was no legal basis for either action. Id. Eventually, the D.C. Council voted and disapproved the contract. Id. ¶ 59.

In the meantime, on April 9, 2008, Mr. Payne met with OCFO officials regarding information technology contracts. Am. Compl. ¶ 34. During the course of this meeting, according to Mr. Payne, "an egregious instance of contractor fraud was brought" to the attention of Mr. Payne and his supervisor, Paul Lundquist, the Executive Director of the Office of Management and Administration. Id. They both agreed that Mr. Payne "should take the unprecedented step of reporting his concerns to the Office of Integrity and Oversight ("OIO"), the OCFO's internal security arm." Id. Mr. Payne and Mr. Lundquist "believed that OCFO's management intentionally circumvented [the] District's contract procurement rules and regulations, and failed to prevent waste and fraudulent practices." Id.

Mr. Payne reported his concerns to the OIO — which, he alleges, then resulted in a series of retaliatory actions and ultimately Mr. Payne's termination. See Am. Compl. ¶¶ 36, 66. Mr. Payne asserts that when Dr. Gandhi found out that Mr. Payne had filed a complaint with the OIO, Dr. Gandhi immediately met with Mr. Lundquist and Mr. Lundquist's supervisor, Angell Jacobs, "and instructed . . . that [Mr. Payne's] tenure within the OCFO needed to end as soon as practicable." Id. ¶ 36. Then, Mr. Payne asserts, in April or May 2008 a retaliatory complaint was lodged against him by Dr. Gandhi's General Counsel, id. ¶ 37; Mr. Payne was subsequently informed in June 2008 that criminal investigations had been launched against him, id. ¶¶ 48, 51; and Mr. Payne was no longer assigned any meaningful tasks. Id. ¶ 56. While these purported retaliatory actions were taking place, Mr. Payne was asked to

"sign and backdate" various procurement contracts, but Mr. Payne refused to do so, "noting that such signatures after the fact of the contract were illegal." Id. ¶ 64.

Mr. Payne was terminated, effective immediately, during a meeting on January 9, 2009. Am. Compl. ¶ 66. The human resources director, two armed security guards, the deputy human resources director, Mr. Lundquist, and his assistant all "stood prominently and publicly in [Mr. Payne's] small office and supervised his removal." Id. ¶ 67. Since Mr. Payne's termination, he alleges that the OCFO "made several defamatory statements about [him] to the public through major area newspapers," id. ¶ 68, which "impugned [his] reputation and marketability in the work place." Id. ¶ 69. The Washington Post article at issue included a statement from Mr. Payne that he and other D.C. officials were pressured to reopen the lottery contract for bids, as well as a statement in response from the CFO's office that "'[n]o member of the City Council or their staffs nor anyone from the executive branch has made any attempt to influence the [contract bidding process] in any way . . . .'" See Mot., Ex. A, Tim Craig & Nikita Stewart, *Rule Changes May Help LTE Keep Contract*, WASH. POST, Apr. 20, 2009; see Am. Compl. ¶ 68. Mr. Payne asserts that this latter statement "was false and effectively stated that [Mr. Payne] lied about . . . facts." Am. Compl. ¶ 68.

Mr. Payne filed his complaint in this Court on April 30, 2010 against the District of Columbia and Dr. Gandhi. Prior to any action by defendants, Mr. Payne filed an amended complaint on May 26, 2010. Mr. Payne's amended complaint states five claims arising from his termination: constitutional defamation, in violation of 42 U.S.C. § 1983 (Count I); retaliatory termination, in violation of the D.C. False Claims Act, D.C. Code § 2-308.16 (Count II); retaliatory termination, in violation of the D.C. Whistleblower Protection Act, D.C. Code

§ 1-615.51, et seq. (Count III); wrongful termination against public policy (Count IV); and

intentional infliction of emotional distress (Count V).[2]

Defendants have filed a motion to dismiss for failure to state a claim under Rule

12(b)(6) of the Federal Rules of Civil Procedure.  After briefing on this motion was complete,

Mr. Payne filed a motion for leave to file a second amended complaint under Rule 15.

## II.  LEGAL STANDARD

### A.  Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows dismissal of a

complaint if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P.

12(b)(6).  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of

the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice

of what the . . . claim is and the grounds upon which it rests . . . .'"  Bell Atlantic Corp. v.

Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); see

also Erickson v. Pardus, 551 U.S. 89, 93-94 (2007).  Although "detailed factual allegations" are

not necessary to withstand a Rule 12(b)(6) motion to dismiss, Bell Atlantic Corp. v. Twombly,

550 U.S. at 555, the complaint "must contain sufficient factual matter, accepted as true, to 'state

a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)

(citation omitted).

---

[2]      Mr. Payne's complaint does not specify whether he is suing Dr. Gandhi in his
official capacity or his individual capacity or both.  During oral argument, the Court raised this
issue and stated that it appeared from the "course of proceedings," Powell v. Alexander, 391 F.3d
1, 22 (1st Cir. 2004) (internal quotations omitted), that both parties understood that Dr. Gandhi
had been sued in both capacities.  The parties agreed.  Accordingly, the Court will consider Mr.
Payne's complaint as against Dr. Gandhi in his official and individual capacities.

On a motion to dismiss under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. at 94; see also Bell Atlantic Corp. v. Twombly, 550 U.S. at 555. The complaint "is construed liberally in the [plaintiff's] favor, and [the Court should] grant [the plaintiff] the benefit of all inferences that can be derived from the facts alleged." Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. See id. at 1276; Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).

## B. Rule 15

Under Rule 15 of the Federal Rules of Civil Procedure, the Court will "freely give leave [to amend a complaint] when justice so requires," FED. R. CIV. P. 15(a)(2), and "'[i]t is common ground that Rule 15 embodies a generally favorable policy toward amendments.'" Howard v. Gutierrez, 237 F.R.D. 310, 312 (D.D.C. 2006) (quoting Davis v. Liberty Mut. Ins. Co., 871 F.2d 1134, 1136-37 (D.C. Cir. 1989)). Where amendment would be futile, however, the Court may in its discretion deny such a motion. See Vreven v. AARP, 604 F. Supp. 2d 9, 13 (D.D.C. 2009). Amendment of a complaint is futile where the proposed amendment does not modify the substance of the complaint, Hantzis v. Grantland, Civil Action No. 08-2190, 2009 WL 3490757, at *1 n.2 (D.D.C. Oct. 30, 2009), or where the complaint as amended would "not survive a motion to dismiss or for judgment on the pleadings." Jung v. Association of Am. Med. Colleges, 226 F.R.D. 7, 9 (D.D.C. 2005); see also Elliott v. Federal Bureau of Prisons, 521 F. Supp. 2d 41, 49 (D.D.C. 2007) ("[T]he Court may deny as futile a motion to amend a complaint

when the proposed complaint would not survive a motion to dismiss."); see also 3 MOORE'S

FEDERAL PRACTICE § 15.15[3] (3d ed. 2000) ("An amendment is futile if it merely restates the

same facts as the original complaint in different terms, reasserts a claim on which the court

previously ruled, fails to state a legal theory, or could not withstand a motion to dismiss.").

## III. DISCUSSION

### A. Constitutional Defamation (Count I)

"A claim for deprivation of a liberty interest without due process based on the

defamatory statements of government officials in combination with a termination may proceed

on one of two theories." Holman v. Williams, 436 F. Supp. 2d 68, 78 (D.D.C. 2006). The first

type of claim is usually referred to as a "reputation-plus" claim, id.; the second is usually referred

to as a "stigma or disability" claim. Id. at 79. Although Mr. Payne's complaint did not specify

which type of claim he asserted, he has since made clear that "[h]is is not a 'reputation plus'

claim that turns on official speech, but on a continuing stigma or disability arising from official

action." Opp. at 6.

The basis for a "stigma or disability" claim "is not the defamatory nature of the

official speech, but 'the combination of an adverse employment action and a stigma or other

disability that foreclose[s] [the plaintiff's] freedom to take advantage of other employment

opportunities.'" Holman v. Williams, 426 F. Supp. 2d at 79 (quoting O'Donnell v. Barry,

148 F.3d 1126, 1140 (D.C. Cir. 1998)) (alterations in original). "Such a stigma or disability may

be found where the official action either (a) automatically bars plaintiff from a specific set of

positions within the government, or (b) generally blocks him from pursuing employment in his

chosen field of interest." Id.  As the court of appeals has stated, such a claim

> requires that the government either have formally deprived one of
> a legal right . . . or have so severely impaired one's ability to take
> advantage of a legal right, such as a right to be considered for
> government contracts or employment or a right to seek
> non-government employment, that the government can be said to
> have 'foreclosed' one's ability to take advantage of it and thus
> extinguished that right.

Mosrie v. Barry, 718 F.2d 1151, 1161 (D.C. Cir. 1983) (internal footnote omitted).  "The nature

of the allegedly defamatory statements is not necessarily central to a 'stigma or disability' claim,

because such a claim turns on official action" — here, a termination — "that itself 'has the effect

of seriously affecting, if not destroying a plaintiff's ability to pursue his chosen profession, or

substantially reducing the value of human capital . . . .'"  Holman v. Williams, 426 F. Supp. 2d

at 80 (quoting O'Donnell v. Barry, 148 F.3d at 1141).  The Due Process Clause is implicated by

such action because "'[t]he Constitution protects an individual's right to follow a chosen trade or

profession without governmental interference.'"  Id. (quoting O'Donnell v. Barry, 148 F.3d

at 1141).  "The burden is on the plaintiff who 'seeks to make out a claim of interference with the

right to follow a chosen trade or profession that is based exclusively on reputational harm [to]

show that the harm occurred in conjunction with, or followed from, some tangible change in

status.'"  Id. (quoting O'Donnell v. Barry, 148 F.3d at 1141) (alteration in original).

      The allegations in this case are very similar to those presented in Holman.  Mr.

Payne, an attorney, has alleged that his termination and the "publicity attached thereto, including

but not limited to the OCFO's comments in the Washington Post, suggested that [he] was

dishonest, a liar and terminated for reasons related to performance," Am. Compl. ¶ 73, and

"created a stigma that foreclosed [his] freedom to take advantage of other employment

opportunities, including pursuing employment in his chosen field as an attorney interested in

government procurement." Id. ¶ 75. As in Holman, although defendants' actions did not

formally preclude Mr. Payne from any employment opportunities, he has alleged that his

termination and the accompanying publicity have had the effect of "'seriously affecting, if not

destroying [his] ability to pursue his chosen profession.'" Holman v. Williams, 436 F. Supp. 2d

at 80 (quoting O'Donnell v. Barry, 148 F.3d at 1141). The Court finds that the alleged

"significant roadblock on [Mr. Payne's] ability to obtain permanent full time employment,"

Am. Compl. ¶ 74, and the alleged foreclosure of Mr. Payne's "freedom to take advantage of other

employment opportunities," id. ¶ 75, are sufficient under Bell Atlantic Corp. v. Twombly and

Ashcroft v. Iqbal to state a "stigma or disability" claim. Accordingly, defendants' motion to

dismiss Count I will be denied.[3]

---

[3]     Defendants' motion to dismiss broadly states: "[Dr.] Ghandi [sic] has immunity
for plaintiff's claims." Mot. at 1. Although this statement might suggest that defendants would
be asserting a qualified immunity argument as to this constitutional defamation claim,
defendants' papers advance no such argument, as defendants acknowledged during oral
argument. Because qualified immunity is an affirmative defense, Pate v. United States, 277 F.
Supp. 2d 1, 7 (D.D.C. 2003), and because it is Dr. Gandhi's burden to show that he is entitled to
such immunity, In re Gaither ex rel. Gaither v. District of Columbia, 655 F. Supp. 2d 69, 96 n.22
(D.D.C. 2009), the Court will not address it at this time. Defendants, however, are free to raise
such a defense later in this litigation should they choose to do so.

## B.  D.C. False Claims Act (Count II)

Under the D.C. False Claims Act

> [n]o employer, including the District of Columbia, shall discharge,
> demote, suspend, threaten, harass, deny promotion to, or in any
> other manner discriminate against an employee in the terms and
> conditions of employment because of lawful acts done by the
> employee on behalf of the employee or others in disclosing
> information to a government or law enforcement agency relating
> to, or in furtherance of, a false claims action, including
> investigation of, initiation of, or testimony or assistance in, an
> action filed or to be filed pursuant to" the D.C. False Claims Act.

D.C. CODE § 2-308.16(b).

To establish a D.C. False Claims Act retaliation claim, a plaintiff must show (1) that he or she engaged in protected activity, (2) that the defendant had knowledge that the plaintiff engaged in such protected activity, (3) that the defendant terminated the plaintiff's employment, and (4) that there was a causal connection between the protected activity and the defendant's termination of the plaintiff's employment.  Kakeh v. United Planning Org., Inc., 655 F. Supp. 2d 107, 115 (D.D.C. 2009); see also United States ex rel. Brown v. Aramark Corp., 591 F. Supp. 2d 68, 76-77 (D.D.C. 2008).  It is established that a False Claims retaliation claim need not satisfy the heightened pleading standard under Rule 9 of the Federal Rules of Civil Procedure; rather, such claims "need satisfy only Rule 8's general pleading requirements."  See United States ex rel. Williams v. Martin-Baker Aircraft Co, Ltd., 389 F.3d 1251, 1259 (D.C. Cir. 2005).

The parties focus their briefing on the first element — whether Mr. Payne was engaged in protected activity.  With respect to this element, in describing the federal False Claims Act, Judge Bates stated:

For the first requirement — engaging in protected activity — "it is sufficient that a plaintiff be investigating matters that reasonably could lead to a viable False Claims Act case." United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 740 (D.C. Cir. 1998) (internal quotation marks omitted). Initiation of a private suit is not required because the FCA's whistleblower provision was intended "to protect employees while they are collecting information about a possible fraud, *before* they have put all the pieces of the puzzle together." Id. However, protected activity does not include "[m]ere dissatisfaction with one's treatment on the job," nor does it encompass "an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations." Id. To be afforded whistleblower protection under the FCA, "the plaintiff's investigation must concern 'false or fraudulent claims.'" Id.

United States ex rel. Brown v. Aramark Corp., 591 F. Supp. 2d at 76-77 (emphasis and alterations in original).[4]

Defendants argue that "[a]lthough plaintiff makes numerous allegations regarding improprieties in the contracting process, he has not alleged that he reported or investigated anyone who made *a false claim for payment* to the District . . . ." Reply at 3 (emphasis added). In other words, defendants contend that Mr. Payne's investigation and the allegations in his complaint do *not* "'concern false or fraudulent claims.'" United States ex rel. Brown v. Aramark Corp., 591 F. Supp. 2d at 77 (quoting United States ex rel. Yesudian v. Howard Univ., 153 F.3d at 740). The Court finds defendants' argument persuasive.

In his opposition, Mr. Payne points to the fact that he "reported to his superior the *waste* that was discovered and that the proposed contract award to W2I would save D.C.

---

[4]     The parties agree that the federal False Claims Act is similar to the D.C. False Claims Act and that case law regarding the federal Act is instructive here. See Opp. at 9; Reply at 3; see also Kakeh v. United Planning Org., Inc., 655 F. Supp. 2d at 115 (retaliation claims under the federal False Claims Act and the D.C. False Claims Act have the same elements).

$40,000,000 over ten years." Opp. at 8-9 (citing Am. Compl. ¶¶ 28-29) (emphasis added).

Disclosing wasteful procedures or practices, however, does not amount to an investigation of

false or fraudulent claims. See Hagood v. Sonoma County Water Agency, 81 F.3d 1465, 1479

(9th Cir. 1996) (holding that the plaintiff presented persuasive evidence that the defendant "may

have been *wasteful*" but did "not . . . establish[] a violation of the False Claims Act") (emphasis

added).

       Mr. Payne also asserts that he "reported fraud and illegality to his superior *in

terms of the illegal process* that had been used by the General Counsel to approve a contract."

Opp. at 9 (citing Am. Compl. ¶ 30) (emphasis added). The conclusory use of the word fraud is

insufficient; here, Mr. Payne's allegations focus on an alleged illegal process to approve a

contract and include no allegations that a false or fraudulent claim was submitted for payment.

See United States ex rel. Brown v. Aramark Corp., 591 F. Supp. 2d at 76-77 (protected activity

does not include "'an employee's investigation of nothing more than his employer's

non-compliance with federal or state regulations.'") (quoting United States ex rel. Yesudian v.

Howard Univ., 153 F.3d at 740).

       Finally, Mr. Payne asserts that he "reported to the [OIO] and the Office of the

Inspector General the contract fraud that he learned about." Opp. at 9 (citing Am. Compl.

¶¶ 35, 42). Specifically, in his complaint, Mr. Payne alleges the following:

> On April 9, 2008, [Mr. Payne] met with OCFO program officials
> regarding OCFO Information Technology . . . contracts. During
> the course of this meeting, *an egregious instance of contractor
> fraud* was brought to [Mr. Payne's] and [his supervisor's]
> attention. Following the meeting, [he and his supervisor] met and
> mutually agreed that [Mr. Payne] should take the unprecedented
> step of reporting his concerns to the [OIO], the OCFO's internal

> security arm. [Mr. Payne] and his supervisor believed that
> OCFO's management intentionally circumvented [the] District's
> contract procurement rules and regulations, and failed to prevent
> waste and fraudulent practices.

Am. Compl. ¶ 34 (emphasis added). Mr. Payne subsequently submitted a complaint regarding such contractor fraud to the OIO. See id. ¶ 36.

The investigation of fraud is the very basis for false claims act statutes. See, e.g., Mann v. Heckler & Koch Defense, Inc., 630 F.3d 338, 342 (4th Cir. 2010) ("The FCA is a statutory scheme designed to discourage fraud against the federal government."). The problem, however, is that Mr. Payne alleges no further facts regarding this alleged contractor fraud. To state a valid retaliation claim, "a plaintiff must show that he or she suspected that the defendant submitted *a false claim* . . . ." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1103 (9th Cir. 2008) (emphasis added); see also United States ex rel. Totten v. Bombardier Corp., 286 F.3d 542, 551 (D.C. Cir. 2002) (in *qui tam* action, stating that the False Claims Act "'attaches liability not to underlying fraudulent activity, but to the claim for payment'") (quoting United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir. 1996)).

Notwithstanding Mr. Payne's single allegation of "contractor fraud," Am. Compl. ¶ 34, his complaint fails to include any factual allegation that a contractor — or anyone else — actually made false demands or submitted false records to the District of Columbia for payment or that he suspected anyone of doing so. Compare Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d at 1104 (finding plaintiff's allegations sufficient to survive a motion to dismiss where the plaintiff alleged that she investigated "facts relating to . . . submission of false claims and false records" and included examples of practices that the plaintiff "suspected to be fraudulent

attempts to inflate Medicare reimbursements") (internal quotations omitted).  The Court therefore

finds that Mr. Payne's complaint fails to state a claim under the D.C. False Claims Act.

As discussed, Mr. Payne has filed a motion for leave to file a second amended

complaint, attaching his proposed second amended complaint.  Mr. Payne contends that his

proposed pleading "asserts more clearly the factual predicate for his claims."  Mot. to Amend

at 2.  Mr. Payne states that the "amendment addresses the following paragraphs in the amended

complaint: Paragraphs 34, 41, 64, and 80."  Id.  Although Mr. Payne does not so specify in his

motion, it is clear that these amendments relate to Mr. Payne's D.C. False Claims Act claim.  The

Court finds, however, that Mr. Payne's proposed second amended complaint fails to modify the

substance of his complaint and would also fail to survive defendants' motion to dismiss.  Mr.

Payne's proposed complaint adds no additional facts with respect to the purported fraud that he

allegedly reported.  The Court therefore will dismiss Count II without prejudice and will deny

Mr. Payne's motion for leave to file a second amended complaint.  Hantzis v. Grantland, 2009

WL 3490757, at *1 n.2; Elliott v. Federal Bureau of Prisons, 521 F. Supp. 2d at 49.

## C.  D.C. Whistleblower Protection Act (Count III)

Under the D.C. Whistleblower Protection Act, "[a] supervisor shall not take, or

threaten to take, a prohibited personnel action or otherwise retaliate against an employee because

of the employee's protected disclosure or because of an employee's refusal to comply with an

illegal order."  D.C. CODE § 1-615.53(a).  Mr. Payne alleges that "[a]s a direct result of [his]

protected disclosures, [d]efendants gradually, and continuously retaliated against [him], including

but not limited to public reprimands . . . , demotion, reassignment . . . to lesser duties, relocation of his office, isolation, and ultimately termination."  Am. Compl. ¶ 87.

In their motion to dismiss, defendants asserted that this claim was time-barred under the applicable statue of limitations.  Mot. at 7.  In his opposition, however, Mr. Payne responded that the District executed several agreements that tolled the statue of limitations on this claim and attached one such agreement as an exhibit.  See Opp. at 13; Opp., Ex. 1, Amended Agreement – #2 to Toll Statute of Limitations, April 12, 2010.  Accordingly, in their reply, defendants conceded that this claim should not be dismissed.  Reply at 1 & n.1.  The Court therefore will deny defendants' motion to dismiss Count III as moot — but only with respect to the District of Columbia and Dr. Gandhi in his official capacity.

The Court will grant defendants' motion to dismiss Count III as to Dr. Gandhi in his individual capacity.  The D.C. Whistleblower Protection Act, as of 2001, did not create a private right of action against individual supervisors.  See Payne v. District of Columbia, 741 F. Supp. 2d 196, 210-11 (D.D.C. 2010); Williams v. Johnson, 537 F. Supp. 2d 141, 148-49 (D.D.C. 2008); Tabb v. District of Columbia, 477 F. Supp. 2d 185, 180 (D.D.C. 2007); Winder v. Erste, Civil Action No. 03-2623, 2005 WL 736639, at *9 (D.D.C. Mar. 31, 2005).  In December 2009, the D.C. Council amended the Act — effective March 11, 2010 — "to explicitly authorize actions against individual supervisors."  Payne v. District of Columbia, 741 F. Supp. 2d at 211 (citing D.C. CODE § 1-615(a)(1)); see 2010 D.C. SESS. LAW. 18-117 (West).  These amendments, however, were not given retroactive effect by the D.C. Council.  See Payne v. District of Columbia, 741 F. Supp. 2d at 211.  All of the alleged acts in this case took place prior to the effective date of the 2009 amendments to the D.C. Whistleblower Protection Act.  Since the

2009 amendments are not retroactive, Mr. Payne's complaint is "governed by the language of the [Act] prior to the 2009 amendments, which does not provide a cause of action against individual supervisors." Payne v. District of Columbia, 741 F. Supp. 2d at 211.

### D. Intentional Infliction of Emotional Distress (Count V)

Mr. Payne has alleged that defendants "intentionally and/or recklessly employed aggressive and systemic efforts to harm and injure [him] including the launching of criminal investigations to destroy his reputation, and to impede his efforts and opportunities such that [d]efendants' efforts were extreme and outrageous." Am. Compl. ¶ 95. He further alleges that defendants' actions "exceed traditional employer-employee conflicts and have caused [him] severe emotional distress and anguish." Id. ¶ 96.

Defendants argue that Mr. Payne's intentional infliction of emotional distress ("IIED") claim is preempted by the Comprehensive Merit Personnel Act ("CMPA"), D.C. Code § 1-601, et seq.; moreover, even if this claim were not preempted, defendants argue that Mr. Payne's allegations do not rise to the level necessary to state an IIED claim. Mot. at 7-9. In response, Mr. Payne asserts that, because he is an at-will employee working for the OCFO, the CMPA does not apply to him and thus his claim is not preempted. Opp. at 13-15. Furthermore, he asserts that he has sufficiently pleaded an IIED claim. Id. at 15-17. Oral argument on this claim focused entirely on whether this Court's holding in Holman v. Williams applied to Mr. Payne. In Holman, this Court concluded that the CMPA applied to an at-will employee working for then-Mayor Anthony Williams. Holman v. Williams, 436 F. Supp. 2d at 76. Accordingly,

17

this Court held that the plaintiff's common law tort claims — including an IIED claim — were preempted.  Id.

As explained in Holman, the District of Columbia Court of Appeals "consistently has held that, with only one exception, the CMPA is the exclusive avenue for aggrieved employees of the District of Columbia to pursue work-related complaints."  Id. at 74.  The CMPA defines "grievance," as

> any matter under the control of the District government which impairs or adversely affects the interest, concern, or welfare of employees, but does not include adverse actions resulting in removals, suspension of 10 days or more, or reductions in grade, reductions in force or classification matters.

D.C. CODE § 1-603.01(10).  "The District of Columbia Court of Appeals has held that common law tort claims . . . are considered grievances and must be pursued through CMPA procedures." Holman v. Williams, 436 F. Supp. 2d at 74 (citing Baker v. District of Columbia, 785 A.2d 696, 697-98 (D.C. 2001); Robinson v. District of Columbia, 748 A.2d 409, 411 (D.C. 2000)).  As this Court has made clear: "Preemption by the CMPA divests the trial court — whether it be the Superior Court or this Court — of subject matter jurisdiction."  Id.

Section 1-602.01 of the D.C. Code provides:

> Except as provided in subsection (c) of this section, *unless specifically exempted from certain provisions*, [Chapter 6, which includes the grievance procedures,] shall apply to all employees of the District of Columbia government, except the Chief Judges and Associate Judges of the Superior Court of the District of Columbia and the District of Columbia Court of Appeals and the nonjudicial personnel of said courts.

D.C. CODE § 1-602.01(a) (emphasis added).  In Holman v. Williams, this Court stated that "[n]o exception for at-will employees is set forth in Section 1-602.01(c) or in any other statutory

provision identified by plaintiff." Holman v. Williams, 436 F. Supp. 2d at 75. In Mr. Payne's case, however, the Court, on its own review of the D.C. Code, has located a statute that does create such an exception. Specifically, Section 1-204.25 of the D.C. Code expressly provides: "[E]mployees of the Office of the Chief Financial Officer of the District of Columbia . . . shall be considered at-will employees *not covered by Chapter 6* of this title . . . ." D.C. Code § 1-204.25(a) (emphasis added). This section — broadly defined to include "all . . . personnel of the [OCFO]," id. § 1-204.25(b)(1); see § 1-204.24a(a), as well as "all other District of Columbia [executive branch] accounting, budget, and financial management personnel[,]" id. § 1-204.25(b)(3) — applies to Mr. Payne, the "Director of Contracts for the OCFO." Am. Compl. ¶ 19. Accordingly, the Court concludes that Mr. Payne's IIED claim is not preempted by the CMPA.

Nevertheless, the Court finds that Mr. Payne's allegations fail to state an IIED claim. To sustain an IIED claim under District of Columbia law, a plaintiff must allege: "(1) 'extreme and outrageous' conduct on the part of the defendant that (2) either intentionally or recklessly (3) caused the plaintiff severe emotional distress." Evans v. District of Columbia, 391 F. Supp. 2d 160, 170 (D.D.C. 2005) (quoting Abourezk v. New York Airlines, Inc., 895 F.2d 1456, 1458 (D.C. Cir. 1990)). "Conduct is 'extreme and outrageous' when it is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community' — an extremely difficult standard to meet." Id. (quoting Kaiser v. United States, 761 F. Supp. 150, 156 (D.D.C. 1991)); see also Halcomb v. Woods, 610 F. Supp. 2d 77, 80 (D.D.C. 2009). As this Court has noted, "[e]specially in the employment context, the standard is exacting." Evans v. District of

Columbia, 391 F. Supp. 2d at 170 (citing Futrell v. Dep't of Labor Fed. Credit Union, 816 A.2d

793, 808 (D.C. 2003); Kerrigan v. Britches of Georgetowne, 705 A.2d 624, 628 (D.C. 1997));

see also Duncan v. Children's Nat'l Med. Ctr., 702 A.2d 207, 211-12 (D.C. 1997) ("[G]enerally,

employer-employee conflicts do not rise to the level of outrageous conduct.").

       As discussed, Mr. Payne alleges that "[d]efendants intentionally and/or recklessly

employed aggressive and systemic efforts to harm and injure [him] including the launching of

criminal investigations to destroy his reputation, and to impede his efforts and opportunities,"

Am. Compl. ¶ 95, and further alleges that defendants' actions "exceed traditional

employer-employee conflicts and have caused [him] severe emotional distress and anguish." Id.

¶ 96.  With respect to the purported criminal investigations, Mr. Payne states the following: "On

June 12, 2008, [he] met with an OIO investigator whereupon . . . , he was informed that a

criminal probe had been launched against him." Id. ¶ 48.  Subsequently, "[o]n June 27, 2008,

[Mr. Payne] had a second meeting with the OIO Director regarding . . . another retaliative

investigation . . . . allegedly initiated by a City Councilmember . . . ." Id. ¶ 51.  As to this second

investigation, Mr. Payne alleges that "[n]o negative finding was made, nor was the complaint

substantiated." Id.  Mr. Payne, however, provides no details as to the nature of the purported

investigations.  Nor does he allege that he was falsely accused.

       Accepting Mr. Payne's minimal allegations as true, defendants' behavior does not

amount to the "outrageous," "extreme," and "utterly intolerable" behavior required to state an

IIED claim.  See Halcomb v. Woods, 610 F. Supp. 2d at 80-81; Evans v. District of Columbia,

391 F. Supp. 2d at 170.  Accordingly, Count V will be dismissed.  See also King v. State, 650 F.

Supp. 2d 1157, 1167 (N.D. Fla. 2009) (holding that an employee's allegations that his employer

conducted an improper investigation of him and threatened him with criminal charges were insufficient to state an IIED claim); Watte v. Maeyens, 828 P.2d 479, 481 n.3. (Or. Ct. App. 1992) (affirming dismissal of employees' IIED claim because, among other reasons, "plaintiffs do not allege that they were falsely accused of criminal . . . conduct, nor do they allege that defendant subjected them to an unwarranted criminal investigation").

### E. Wrongful Termination Against Public Policy (Count IV)

Like Mr. Payne's IIED claim, his wrongful termination claim also "is not preempted by the CMPA because the statute offers no administrative recourse to at-will employees related to their termination." Holman v. Williams, 436 F. Supp. 2d at 76 n.4.  Because defendants advance no other argument with respect to the sufficiency of Mr. Payne's wrongful termination claim, the Court will deny defendants' motion as to Count IV — but only as to the District of Columbia and Dr. Gandhi in his official capacity.

The Court finds that Dr. Gandhi is entitled to absolute immunity and therefore will grant the defendants' motion to dismiss Count IV as to Dr. Gandhi in his individual capacity. "A public official of the District of Columbia acting 'within the outer perimeter of his duties' enjoys absolute immunity from liability for common law torts, so long as the function being performed is discretionary rather than purely ministerial." Holman v. Williams, 436 F. Supp. 2d at 80 (quoting Expeditions Unlimited Aquatic Enters., Inc. v. Smithsonian Inst., 566 F.2d 289, 292 & n.5 (D.C. Cir. 1977)).  "This immunity exists 'to ensure that when public officials exercise discretion in carrying out their duties, concern about tort liability will not inhibit the fearless,

vigorous and effective administration of policies of government.'" <u>Id</u>. (quoting <u>Kendrick v. Fox Television</u>, 659 A.2d 814, 819 (D.C. 1995)).

Defendants assert that Dr. Gandhi has absolute immunity for Mr. Payne's two common law claims. Mot. at 9. Because the Court has concluded that Mr. Payne has not stated a valid IIED claim, the Court need only consider the issue of absolute immunity with respect to Mr. Payne's wrongful termination claim. The decision to fire Mr. Payne clearly was "within the outer perimeter" of Dr. Gandhi's duties. <u>See</u> <u>Holman v. Williams</u>, 436 F. Supp. 2d at 81 (internal quotations omitted). The parties do not dispute that Mr. Payne was an at-will employee. <u>See</u> Opp. at 14. Nor could they: the D.C. Code expressly provides that "employees of the Office of the Chief Financial Officer of the District of Columbia . . . shall be appointed by, shall serve at the pleasure of, and shall act under the direction and control of the Chief Financial Officer of the District of Columbia, and shall be considered at-will employees . . . ." D.C. CODE § 1-204.25(a) (emphasis added). Accordingly, Dr. Gandhi, the Chief Financial Officer of the District of Columbia, in his individual capacity is immune from tort liability for Mr. Payne's alleged wrongful discharge. <u>See</u> <u>Holman v. Williams</u>, 436 F. Supp. 2d at 81.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion to dismiss [Dkt. No. 6] will be GRANTED in part and DENIED in part and plaintiff's motion for leave to file a second amended complaint [Dkt. No. 10] will be DENIED. An Order consistent with this Opinion shall issue this same day.

SO ORDERED.

/s/
———————————————
PAUL L. FRIEDMAN

DATE:  March 29, 2011                    United States District Judge