UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                              )
ERIC W. PAYNE,                )
                              )
          Plaintiff,          )
                              )
          v.                  )     Civil Action No. 10-679 (RWR)
                              )
DISTRICT OF COLUMBIA, et al., )
                              )
          Defendants.         )
_____)

MEMORANDUM OPINION AND ORDER

Plaintiff Eric Payne's pending amended complaint against defendants District of Columbia ("D.C.") and Dr. Natwar Gandhi, D.C.'s Chief Financial Officer ("CFO"), alleges violations of the Fifth Amendment and the D.C. Whistleblower Protection Act ("WPA"), D.C. Code § 1-615.51, et seq., constitutional defamation, and wrongful termination.  D.C. and Councilmembers Jack Evans and Jim Graham have filed objections to Magistrate Judge Deborah Robinson's order denying their motions to preclude Payne from deposing former Chair of the D.C. Council and current Mayor Vincent Gray and the Councilmembers.  The movants all argue that the D.C. Speech or Debate Clause, D.C. Code § 1-301.42, entitles them to absolute legislative immunity from providing deposition testimony and producing documents, since their communications with the CFO were integrally related to their statutorily-required review of a proposed lottery contract. Payne opposes, arguing that the Clause does not protect the

-2-

officials' attempts to influence the CFO or to facilitate Payne's termination.  Because Payne has presented evidence that Gray and Graham engaged in political efforts to exhort the executive that were not protected under the Speech or Debate Clause, and because the Mayor has not shown that complying with the deposition subpoena would unduly burden him, the objections will be overruled in part.  Because the officials' meetings with the CFO otherwise involved protected speech and Payne has not shown conduct by Evans that was not protected, the objections will be sustained in part.

BACKGROUND

In July or August of 2004, Payne was hired to serve as Assistant General Counsel for procurement in D.C.'s Office of the CFO.  (Pl.'s Opp'n to Collective Mots. for Protective Orders ("Pl.'s Opp'n as to Prot. Orders"), Ex. 1, Aff. of Eric W. Payne ("Payne Aff.")[1] ¶ 1; Am. Compl. ¶ 5.)  He later was promoted to Director of Contracts and, in that capacity, initiated the process of awarding to one of two bidders a contract to be the service provider for the D.C. lottery.  (Payne Aff. ¶¶ 1-2; Am. Compl. ¶¶ 10, 26.)  Following a fair, reasonable, and objective competition, Payne ultimately selected a company called W2I, a

---

[1] The Councilmembers "do not contest the factual assertions in Plaintiff's affidavit for purposes of the motion to quash." (Councilmembers' Obj'ns to the Magistrate Judge's Mem. Op. and Order Denying Councilmembers' Mot. to Quash Subpoenas ("Councilmembers' Obj'ns") at 18 n.1.)

-3-

joint venture comprised of W2Tech, LLC and Intralot, which
apparently offered a technologically superior product at lower
prices than its competition did. (Payne Aff. ¶¶ 2, 13; Am.
Compl. ¶¶ 26-29, 58.)  However, the proposed lottery contract was
contingent upon the D.C. Council's review and approval.
(Councilmembers' Reply to Pl.'s Opp'n as to Prot. Orders ("Reply
as to Prot. Orders") at 1 (citing D.C. Code § 1-204.51(c)); see
also D.C.'s Obj'ns to Magistrate Judge's Mem. Op. and Order of
October 31, 2011 Denying the District's Mot. for a Protective
Order on Behalf of Mayor Gray ("D.C.'s Obj'ns") at 3 (stating
that the Home Rule Act "requires D.C. Council approval for all
multiyear contracts and for all contracts in excess of one
million dollars").)[2]

According to Payne, Graham and Evans cajoled the CFO into
withdrawing W2I's contract and caused Payne's wrongful
termination.[3]  (See generally Payne Aff.)  Payne alleges that he

---

[2] Payne's suggestion that the then-Councilmembers's role in
reviewing the contract was an executive function is misplaced.
(See Pl.'s Consolidated Opp'n to D.C.'s and Councilmembers'
Obj'ns to Magistrate Judge's Mem. Op. and Order of October 31,
2011 Denying the District's Mot. for a Protective Order ("Pl.'s
Consol. Opp'n") at 14.)

[3] The Councilmembers first challenged the procurement
process during a Council Roundtable held on April 7, 2008.  (Am.
Compl. ¶ 31; Payne Aff. ¶ 8.)  They apparently "opposed the
proposed contract because of the involvement of W2Tech."  (Am.
Compl. ¶ 31.)  On April 9, 2008, during a hearing of the Council
of the Whole Budget, Evans stated that he had convinced then-
Mayor Fenty to withdraw W2I's contract and Graham "urged the CFO"
to do the same.  (Payne Aff. ¶ 8.)  However, since Payne stated
during the September 23, 2011 hearing before the magistrate judge

-4-

was "compelled to . . . participate in several highly unusual meetings" in April and May of 2008, "in which the CFO, certain city council members, [his] supervisors, and [he] met to specifically discuss the proposed lottery contract" and the involvement of Intralot minority partner Warren Williams, Jr. (Payne Aff. ¶ 7; see also Am. Compl. ¶ 43.)  The Councilmembers never asked "about the technical proficiency[] . . . or price of the proposed lottery contract." (Payne Aff. ¶ 7.)  Instead, Evans, who considered Williams to be "a slumlord," allegedly stated during one meeting[4] that "people have a problem with" Williams and asked whether they could "just get rid of [him]." (Id.; Pl.'s Opp'n as to Prot. Orders at 8.)  Graham referred Payne to a woman named Dottie Love Wade, who questioned Williams's "ability to handle the online gaming contract[] since Williams Sr. only previously [had] handled the Instant Tickets contract." (Payne Aff. ¶ 9; Pl.'s Opp'n as to Prot. Orders at 9.)

Payne told the Councilmembers that "forcibly removing [and replacing] a joint venturer . . . after [completing] the source selection process" would be illegal. (Payne Aff. ¶ 7.)  Given

---

that he is "not interested in the communications in the legislative roundtable or the Council on the whole[,]" Payne v. D.C., 279 F.R.D. 1, 5 (D.D.C. 2011), those communications are not relevant here.

[4] This meeting allegedly occurred on April 8, 2008, and included Evans, Gandhi, and others. (Pl.'s Consol. Opp'n at 7.)

-5-

this "mounting pressure to modify the awarded lottery contract
award[,]" Payne filed his first complaint with the Office of
Integrity and Oversight ("OIO") in the Office of the CFO ("OCFO")
in April of 2008.  (<u>Id.</u> ¶ 3; <u>see also</u> Am. Compl. ¶ 34.)  He filed
several additional complaints with OIO, addressing the same
concerns, between May and July of that year.  (Payne Aff. ¶ 3.)
Payne also reported "the pressure that the CFO and others were
applying to [him]" to the D.C. Office of Inspector General's
("OIG") audit and criminal investigative representatives.  (<u>Id.</u>
¶ 6; <u>see also</u> Am. Compl. ¶¶ 39, 41.)

     Payne allegedly met with Gray, Gandhi, and at least one
unnamed elected official for the last time on May 5, 2008.
(Payne Aff. ¶ 10; Am. Compl. ¶ 45.)  Afterwards, "Gray asked
Gandhi to remain behind" and meet privately.  (Payne Aff.
¶ 10.)  According to Payne, Gray then pressured Gandhi "to end
the contract solicitation and to demote and/or terminate [Payne]
in order to pave the way to re-bid the lottery contract."  (<u>Id.</u>)
After Gandhi emerged from this private meeting, he allegedly
"repeatedly cajoled [Payne] to cancel the lottery contract and
reopen the [procurement] process."  (<u>Id.</u> (internal quotation
marks omitted).)  Graham also told Payne that "he had a bone to
pick with [him]," that Graham "had discussed [the issue] with
Gandhi" and that Gandhi would discuss it with Payne.[5]  (<u>Id.</u>

---

[5] Payne's affidavit does not specify the date of the
meeting, though he suggests that it took place sometime after

-6-

¶ 9.)  On May 15, 2008, Gandhi met with Payne's supervisor, Paul
Lundquist, and the OCFO's Director of Operations, Angell Jacobs
in May of 2008.  (<u>Id.</u> ¶¶ 3, 4, 6.)  The CFO stated that Payne's
"tenure within the OCFO needed 'to end as soon as practicable.'"
(<u>Id.</u> ¶ 4.)

On July 1, 2008, Lundquist notified Payne that Gandhi
planned to demote him. (Payne Aff. ¶ 12; Am. Compl. ¶ 53.)
Lundquist and Jacobs met with Payne to demote him on July 7,
2008, and Payne recorded the conversation.  (Payne Aff.
¶ 12; Am. Compl. ¶ 52.)  By then, Payne had learned from W2I
representatives who met with Gray and Graham that Gandhi assured
Gray and Graham that Payne "would not be in [his] position much
longer and that the contract . . . would be re-bid." (Payne Aff.
¶ 12.)  Jacobs, however, told Payne that the OCFO had "absolutely
no[]" concerns about the procurement process or Payne's role
within it.  (<u>Id.</u>)  She added that "Graham is on a personal
vendetta here and, you know, he thinks the way to get what he
wants is to find a way to discredit the people [who] were
involved in the process. . . .  [F]or Gray and Graham, this is
all personal.  This is about their friends, or who is not their
friends for Graham[.]"  (<u>Id.</u>)

The D.C. Council voted to disapprove the W2I contract in
December of 2008.  (<u>Id.</u> ¶ 13; Am. Compl. ¶ 59.)  On January 9,

April 9, 2008.  (<u>See</u> Pl.'s Consolidated Opp'n at 8.)

2009, Payne was fired and escorted out of the building in the presence of "[t]he Human Resources ("HR") Director, . . . two armed security guards, the Deputy HR Director, [the] Deputy Logistics Director, Lundquist[,] and his assistant[.]"  (Payne Aff. ¶ 14.)

        After Payne served Mayor Gray and the Councilmembers with subpoenas, D.C. moved for a protective order barring Payne from taking the Mayor's deposition.  It argued that the deposition would unduly burden the Mayor and that the information sought, which was protected by the Speech or Debate Clause, D.C. Code § 1-304.42, was in any event available from other sources. (D.C.'s Mot. for a Protective Order on Behalf of Mayor Vincent C. Gray ("D.C.'s Mot. for Prot. Order") at 1; D.C.'s Mem. of P. & A. in Supp. of its Mot. for a Prot. Order ("D.C.'s Mem. of P. & A.") at 3-4.)  Citing the same Speech or Debate privilege, Evans and Graham also moved under Federal Rule of Civil Procedure 45(c)(3)(A)(iii) to quash the subpoenas served upon them.  (See generally Councilmembers' Mot. to Quash Subpoenas.)  Payne's opposition proffered that he would seek deposition testimony as to political and personnel-related conversations between the Councilmembers and the CFO during the lottery contract review process.  (Pl.'s Opp'n as to Prot. Orders at 16.)  He argued that the information sought falls outside the legislative sphere and supports his claims for retaliation and wrongful termination. (Id.)

-8-

The motions were referred for decision to Magistrate Judge
Robinson.  At a hearing before her, the Councilmembers' counsel
stated that Evans, Graham "and Defendant Gandhi had [had]
conversations regarding the D.C. Lottery contract of the type
described by Plaintiff in his affidavit." Payne v. D.C., 279
F.R.D. 1, 3 (D.D.C. 2011).  However, the Councilmembers disputed
that the meetings attended by Payne, his supervisors, the CFO,
and Councilmembers were improper.  (Councilmembers' Reply as to
Prot. Orders at 3 n.1.)  Magistrate Judge Robinson concluded that
"the communications which are the subject of [Payne]'s discovery
request are the current and former councilmembers' 'contact[s]
[with] an executive agency in order to influence its conduct[.]'"
Payne, 279 F.R.D. at 7 (quoting Jewish War Veterans v. Gates, 506
F. Supp. 2d 30, 54 (D.D.C. 2007)) (alteration in original).
Accordingly, since "the communications at issue were no more than
attempts to 'cajole' or 'exhort' Defendant Gandhi, a member of
the District's executive branch," the magistrate held that "they
are not 'legislative acts' for which the Speech or Debate Clause
affords a shield from discovery." Id.  The magistrate judge also
rejected the argument that complying with Payne's subpoena would
unduly burden Mayor Gray. Id.  She stated that Gray had personal
knowledge of the conversations Payne described and that the
substance of Gray's testimony could not be obtained from any
other source. Id.  Her order required that the three depositions
each be limited to three and one-half hours, and that they be

limited to "discussions with Defendant Gandhi regarding the D.C. Lottery Contract[.]" <u>Id.</u> at 8.

D.C. timely filed objections on behalf of Mayor Gray, challenging two of the magistrate judge's conclusions as contrary to law. (D.C.'s Obj'ns at 1-2.) D.C. argued that the magistrate "incorrectly found that the Mayor had information that could not be obtained from any other source" and "improperly determined that conversations between then-Chairman Gray and members of the executive branch regarding a contract pending before the [D.C.] Council for approval were not part of his legislative duties." (<u>Id.</u> at 1-2.) To support these arguments, D.C. newly proffered Mayor Gray's declaration that he could recall having attended only one "fairly large" meeting with the CFO and others, the purpose of which was "to inform [himself] and [his] staff about pending legislation so that [he] could determine how [he] would vote." (Gray Decl. ¶¶ 5-7.) Gray also stated that he did "not recall having a private meeting with the [CFO] on the lottery contract[,]" and denied any personal knowledge of or participation in the decisions to demote and terminate Payne. (<u>Id.</u> ¶¶ 6, 8-10.) Finally, D.C. reiterated that the Mayor's rank renders any deposition of him unduly burdensome. (<u>Id.</u> at 5.) The Councilmembers also objected to the magistrate judge's ruling, challenging its omission of "the Council's affirmative statutory duty . . . to review multiyear contracts," its conclusion that "the Councilmembers' inter-branch communications

-10-

. . . were unrelated to the Councilmembers' legislative
activities," and its "improper[] consider[ation of] the purported
motives of the Councilmembers in determining whether their
conversations with the executive branch were protected."
(Councilmembers' Obj'ns at 1-3.)

Payne opposed the objections, arguing that the
Councilmembers sought to influence the OCFO's modification or
cancellation of the lottery contract, that such political
communications do not warrant Speech or Debate protection, and
that Gray, alone, can testify about his own state of mind during
his meetings with Gandhi. (See generally Pl.'s Consolidated
Opp'n to D.C.'s and the Councilmembers' Objections ("Pl.'s
Consol. Opp'n").) In addition, Payne notes that Gandhi admitted
during a deposition post-dating the magistrate judge's opinion
and order "to having the asserted private meeting with Gray
following a meeting with Gray and Gandhi's staff." (Id. at 6.)

Magistrate Judge Robinson has stayed her order pending
resolution of the movants' objections.

                            DISCUSSION

A magistrate judge's findings are "entitled to great
deference," Page v. Pension Benefit Guar. Corp., 498 F. Supp. 2d
223, 225 (D.D.C. 2007), and may be modified or set aside only if
"'found to be clearly erroneous or contrary to law[,]'" Poett v.
United States, Civil Action No. 07-1374 (CKK), 2012 WL 698144, at
*2 (D.D.C. Mar. 6, 2012) (quoting Local Civil Rule 72.2(c);

accord Moore v. Napolitano, 723 F. Supp. 2d 167, 170-71 (D.D.C.
2010).  "[T]o find clear error, [a court] must be 'left with the
definite and firm conviction that a mistake has been committed.'"
Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't,
Inc., 659 F.3d 13, 22 (D.C. Cir. 2011) (quoting Anderson v. City
of Bessemer City, 470 U.S. 564, 573 (1985)).  A court "may not
set aside [the magistrate's] findings of fact 'simply because [it
is] convinced that [it] would have decided the case
differently.'"  Am. Soc'y, 659 F.3d at 22.  The magistrate
judge's legal conclusions are reviewed de novo.  PowerShare, Inc.
v. Syntel, Inc., 597 F.3d 10, 15 (1st Cir. 2010) ("When[] . . .
review of a non-dispositive motion . . . turns on a pure question
of law, that review is plenary under the 'contrary to law'"
standard) (citation omitted); accord Am. Ctr. for Civil Justice
v. Ambush, 794 F. Supp. 2d 123, 129 (D.D.C. 2011) ("The 'contrary
to law' standard[] . . . permits de novo review of a magistrate
judge's legal conclusions."); see also United States v. Renzi,
651 F.3d 1012, 1020 (9th Cir. 2011) ("Whether the [Speech or
Debate] Clause precludes [deposition testimony] is a question of
law[.]")[6]

---

[6] A litigant "must take before the magistrate[] not only
[its] best shot, but all of [its] shots[,]" Klayman v. Judicial
Watch, Inc., 628 F. Supp. 2d 84, 94-95 (D.D.C. 2009) (internal
quotation marks and citation omitted), since any matter not
previously raised may be deemed to have been waived.  Smith v.
Cafe Asia, 724 F. Supp. 2d 125, 127 (D.D.C. 2010).  In their
first filings about the magistrate judge's ruling, both Gray and
Payne submitted new evidence not presented to the magistrate

-12-

Federal Rule of Civil Procedure 45 enumerates circumstances under which a court "must quash or modify a subpoena." Fed. R. Civ. P. 45(c)(3)(A). For example, quashing or modifying is required if a subpoena "requires disclosure of privileged or other protected matter, if no exception or waiver applies; or . . . [if it] subjects a person to undue burden." Id. at 45(c)(3)(A)(iii)-(iv). A court should consider whether mere modification suffices to satisfy Rule 45, Educ. Fin. Council v. Oberg, Misc. Action No. 10-79 (JDB), 2010 WL 3719921, at *2 (D.D.C. Mar. 8, 2010), since "[t]he quashing of a subpoena is an extraordinary measure, and is usually inappropriate absent extraordinary circumstances[,]" Flanagan v. Wyndham Int'l, Inc., 231 F.R.D. 98, 102 (D.D.C. 2005). The movants bear the burden of demonstrating "that the subpoena violates Rule 45." Educ. Fin. Council, 2010 WL 3719921, at *2. Where a movant asserting undue burden "seeks to prevent a deposition entirely," his "burden of proof is particularly great[.]" Guantanamera Cigar Co. v.

---

judge. (See Gray Decl.; Pl.'s Consol. Opp'n at 6, 15-16 (referring to Gandhi's deposition).) The new evidence should not bear upon a review of the decision reached by the magistrate judge based upon the evidence she did have before her. Here, though, both parties injected new evidence and neither should be heard to complain. Moreover, given both parties' opportunity to discuss the new information in these first filings, Payne's chance -- if he were to lose now -- to seek anew to depose Gray based upon new evidence, and the importance to the parties going forward of finally resolving whether Gray can be deposed, this new evidence will not be disregarded. That accommodation will not be unlimited, however, and the later submissions of new evidence will not be accepted.

Corporacion Habanos, S.A., 263 F.R.D. 1, 8 (D.D.C. 2009) (citing

Westinghouse Elec. Corp. v. City of Burlington, 351 F.2d 762, 766

(D.C. Cir. 1965)).

A key question is whether the Speech or Debate Clause

confers upon the Councilmembers and Mayor "a testimonial and non-

disclosure privilege that prevents [them] from being compelled to

answer questions about legislative activity[.]"[7]  Howard v.

Office of Chief Admin. Officer of U.S. House of Representatives,

793 F. Supp. 2d 294, 299 (D.D.C. 2011).  The Supreme Court has

directed that the Speech or Debate Clause be read "broadly to

effectuate its purposes."  Eastland v. U.S. Servicemen's Fund,

421 U.S. 491, 501 (1975).  However, "[t]he privilege is not

designed to protect the reputations of [legislators.]"  Brown &

Williamson Tobacco Corp. v. Williams, 62 F.3d 408, 419 (D.C. Cir.

1995).  "[O]nly . . . those activities that are 'clearly a part

of the . . . due functioning of the [legislative] process'" are

privileged.  Id. at 415 (quoting United States v. Brewster, 408

U.S. 501, 516 (1972)) (emphasis in original).

---

[7] "[T]he legislative history and the case law interpreting
[the D.C. Speech or Debate Clause] make clear that it is modeled
on the Speech or Debate Clause of the United States
Constitution."  Williams v. Johnson, 597 F. Supp. 2d 107, 112
(D.D.C. 2009) (internal quotation marks and citation omitted).
"In construing and applying the District's Speech or Debate
statute, courts have . . . consistently turned to and relied upon
precedent interpreting its analogous federal counterpart."  Id.
at 112-13.

-14-

"'[I]n determining whether legislative immunity applies, [a court asks] whether the action at issue was undertaken within the 'legislative sphere.'" <u>Williams v. Johnson</u>, 597 F. Supp. 2d 107, 113 (D.D.C. 2009) (citation omitted).  "'Once the legislative act test is met, [immunity] is absolute,'" <u>id.</u> at 115 (quoting <u>MINPECO, S.A. v. Conticommodity Services, Inc.</u>, 844 F.2d 856, 862 (D.C. Cir. 1988)) -- even if "'the[] [legislator's] conduct, if performed in other . . . contexts, would . . . be unconstitutional or otherwise contrary to'" law.  <u>Brown</u>, 62 F.3d at 415 (quoting <u>Doe v. McMillan</u>, 412 U.S. 306, 312-13 (1973)).  However, "only 'purely legislative activities,' <u>United States v. Brewster</u>, 408 U.S. 501, 512 (1972) - i.e., acts inherent in the legislative process[,]" are protected.  <u>Chastain v. Sundquist</u>, 833 F.2d 311, 314 (D.C. Cir. 1987).  Such acts "'must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation[.]'"  <u>Id.</u> (quoting <u>Gravel v. United States</u>, 408 U.S. 606, 625 (1972)).  Protected legislative acts include "'delivering an opinion, uttering a speech, or haranguing in debate; proposing legislation; voting on legislation; making, publishing, presenting, and using legislative reports; authorizing investigations and issuing subpoenas; holding hearings; and introducing material at Committee hearings.'" <u>Williams</u>, 597 F. Supp. 2d at 113-114 (quoting <u>Fields v. Office of</u>

-15-

Eddie Bernice Johnson, 459 F.3d 1, 9 (D.C. Cir. 2006)).  The
Clause also protects "[a] legislature's efforts to acquire
information during formal committee investigations[.]"  Id. at
114.

Neither the Supreme Court nor the D.C. Circuit has reached
the issue of whether informal information-gathering falls "within
the legislative sphere."  Id.  At least two decisions in this
district nonetheless have held that such information-gathering
"is protected . . . 'so long as the information is acquired in
connection with or in aid of an activity that qualified as
'legislative' in nature.'"  Id. (quoting Jewish War Veterans, 506
F. Supp. 2d at 57.)  These opinions reason that "at the end of
every protected ['informal'] information-gathering venture is a
['formal'] legislative act . . . [such as] a piece of draft
legislation, [or] . . . a meeting to help push through a pending
bill."  Jewish War Veterans, 506 F. Supp. 2d at 56-57; see also
Williams, 597 F. Supp. 2d at 114.  "'[T]he acquisition of
knowledge through informal sources is a necessary concomitant of
legislative conduct and thus should be within the ambit of the
privilege so that congressmen are able to discharge their
constitutional duties properly.'"  Jewish War Veterans, 506 F.
Supp. 2d at 55 (quoting McSurely v. McClellan, 553 F.2d 1277,
1287 (D.C. Cir. 1976)).

"That [legislators] generally perform certain acts in their
official capacity . . . does not necessarily make all such acts

legislative in nature." <u>Gravel</u>, 408 U.S. at 625.  Legislators

"may cajole, and exhort with respect to the administration of a

federal statute - but such conduct, though generally done, is not

protected legislative activity."  <u>Id.</u> at 625; <u>Hutchinson v.</u>

<u>Proxmire</u>, 443 U.S. 111, 122 n.10 ("Regardless of whether and to

what extent the . . . Clause may protect calls to . . . agencies

seeking information, it does not protect attempts to influence

the conduct of executive agencies or libelous comments made

during the conversations"); <u>accord</u> <u>Williams</u>, 597 F. Supp. 2d at

117 ("a legislator's efforts to cajole or influence an executive

agency - as opposed to a legislator's information-gathering or

investigative efforts - are not protected by legislative

immunity[.]").  Neither does "the Speech or Debate Clause reach[]

. . . [an] attempt to influence [an executive agency] that is in

no wise related to the due functioning of the legislative

process." <u>United States v. Johnson</u>, 383 U.S. 169, 172 (1966);

<u>accord</u> <u>Jewish</u> <u>War Veterans</u>, 506 F. Supp. 2d at 54.  The D.C.

Circuit also has held that "personnel actions regarding the

management of congressional food services are too remote from the

business of legislating to rank 'within the legislative sphere.'"

<u>Walker v. Jones</u>, 733 F.2d 923, 928 (D.C. Cir. 1984).  These

political -- as distinct from legislative -- acts are "beyond the

coverage of the Speech or Debate Clause." <u>Jewish War Veterans</u>,
506 F. Supp. 2d at 53-54.[8]

I.   OBJECTIONS TO SPEECH OR DEBATE ANALYSIS

        Councilmembers Evans and Graham assert three objections to
the magistrate judge's opinion and order.  First, they argue that
she "fail[ed] to acknowledge the Council's affirmative statutory
duty under section 451 of the Home Rule Act to review multiyear
contracts[.]"  (Councilmembers's Obj'ns at 1-2, 6-7.)  Second,
they assign error to the magistrate's conclusion that the
Councilmembers' communications with executive officials about the
lottery contract did not relate to the Councilmembers'
legislative activities.  (<u>Id.</u> at 2.)  Finally, they challenge the
magistrate's consideration of the Councilmembers's "purported
motives."  (<u>Id.</u> at 2-3 ("It is 'not consonant with our scheme of
government for a court to inquire into the motives of
legislators.'") (quoting <u>Tenney v. Brandhove</u>, 341 U.S. 367, 377
(1951)).)  D.C. likewise argues that Gray's communications were
all protected by D.C.'s Speech or Debate Clause.  (D.C.'s Obj'ns
at 2, 9-12.)  Payne opposes, arguing that certain of Gray's and

_____

        [8] Other examples of political acts "'include a wide range of
legitimate 'errands' performed for constituents, the making of
appointments with Government agencies, assistance in securing
Government contracts, preparing so-called 'news letters' to
constituents, news releases, and speeches delivered outside the
Congress.'"  <u>Jewish War Veterans</u>, 506 F. Supp. 2d at 53 (quoting
<u>Brewster</u>, 408 U.S. at 512).

-18-

Graham's communications with the OCFO were personal efforts to have Payne fired.  He also states that since Evans, Graham, and Gray all attempted to influence the executive to withdraw and re-bid the W2I contract, their communications as to the contract were political rather than protected.  (Pl.'s Consol. Opp'n at 7-9, 11, 13-15.)

The Councilmembers argue that "it is incontestable that [their] review of the Lottery Contract was legislative in nature." (Councilmembers' Obj'ns at 10; see also D.C.'s Obj'ns at 10-11.)  They note that "[a]t all times," their communications and information-gathering meetings with the OCFO "bore directly on whether the Councilmembers would support or not support" the lottery contract.  (Councilmembers' Obj'ns at 10.)  Payne argues that Gray and the Councilmembers "cajole[d], exhort[ed], or exert[ed] influence in order to modify or cancel an already awarded contract" (Pl.'s Consol. Opp'n at 14), and that they pursued a personal vendetta against Payne rather than "seeking information that would support or oppose the passage of the Lottery Contract." (Id. at 15.)

Certain of the movants' meetings with the OCFO were information-gathering missions that related directly to the pending lottery contract.  Payne concedes that the Councilmembers and their associates expressed substantive concerns over the propriety of hiring Williams as a contractor.  For example, Payne

"was repeatedly asked about Warren Williams['s] . . . other
business dealings with the District[.]"  (Payne Aff. ¶ 7.)
During a meeting held on April 8, 2008, Evans stated that
Williams was a slumlord and asked whether the OCFO could "just
get rid of" him.  (Payne Aff. ¶ 7; see also Am. Compl. ¶ 43.)
When told that replacing Williams would be legally impermissible,
Evans followed up by asking why.  (Payne Aff. ¶ 7; Pl.'s Opp'n as
to Prot. Orders at 8.)  Further, Graham's associate, Dottie Love
Wade, suggested that Williams was unfamiliar with online gaming,
having only had prior experience with the "Instant Tickets"
contract.  (Payne Aff. ¶ 9; Pl.'s Opp'n as to Prot. Orders at 9.)
Such communications were "'an integral part of the deliberative
. . . processes by which [Councilmembers] . . . consider[ed]
[the] passage or rejection of proposed legislation[,]'"
Chastain, 833 F.2d at 314 (quoting Gravel, 408 U.S. at 625), and
"occur in the regular course of the legislative process."
Fields, 459 F.3d at 10 (internal quotation marks and citation
omitted).  Legislative immunity shields these communications.

     However, Payne has made a showing that other of Gray's and
Graham's communications relating to Payne's termination had no
bearing upon the merits of whether the lottery contract should be
approved, and do not warrant Speech or Debate protection.  Payne
learned from W2I representatives that Gray and Graham discussed
with Gandhi Payne's removal.  Jacobs told Payne that Graham has a

-20-

vendetta and wants to discredit Payne, and that Gray's interest in Payne was unrelated to the merits of the contract.  Graham allegedly told Gandhi of a bone Graham had to pick with Payne and told Payne he would hear from Gandhi about it.  Payne states that Gray and Gandhi met privately on May 5, 2008, and alleges that Gray pressured Gandhi to fire Payne.  Ten days later, Gandhi told Payne's supervisor that Payne needed to be removed.  Payne was demoted in July and fired in January.

Legislative immunity does not attach to these communications because "the Speech or Debate Clause [does not] reach[] . . . [an] attempt to influence [an executive agency] that is in no wise related to the due functioning of the legislative process." Johnson, 383 U.S. at 172; Hutchinson, 443 U.S. at 122 n.10 (stating that the Clause "does not protect attempts to influence the conduct of executive agencies").  Payne produced sufficient evidence for the magistrate judge to find that Gray and Graham challenged Payne's employment in an effort to cajole Gandhi, not to pursue legislative business.  See Fields, 459 F.3d at 17 ("Neither the history of the Clause nor Supreme Court precedent provides a basis on which to conclude that personnel decisions are 'legislative acts[.]'").[9]  The movants argue that even

_____

[9] There is no need to address the arguments that the magistrate judge improperly omitted citation to or discussion of the Home Rule Act, and improperly considered the movants' legislative motives.  In any event, neither one is persuasive. In her opinion and order, Magistrate Judge Robinson noted Payne's

politically motivated or improper meetings with non-legislators
that nevertheless were legislative in character are protected by
the Clause.  Asking the executive about personnel in a company
slotted to win a contract the Council must approve is
information-gathering within the legislative sphere.  Cajoling
the executive to fire the executive's own personnel is not.
Payne's termination or retention does not inform a legislative
decision on the merits of the lottery contract and whether
approval is in the best interests of District citizens.
Retention or termination of Payne might have affected the best
interests of District citizens, but that decision is an executive
one, not a legislative one.  See Thillens, Inc. v. Cmty. Currency
Exch. Ass'n of Ill., Inc., 729 F.2d 1128, 1130 (7th Cir. 1984)
(recognizing that the Supreme Court denied protection where

---

concession that "Council review, hearing consideration *and
approval* [are] . . . protected by legislative immunity," Payne,
279 F.R.D. at 2, and articulated the Councilmembers' argument
that "their actions [we]re so closely linked to their *review of*
the lottery contract that the actions must still be protected."
Id. at 3.  Contrary to the movants' objection (see, e.g.,
Councilmembers' Obj'ns at 1-2, 6-7), and notwithstanding the lack
of a specific citation to the Home Rule Act, the magistrate judge
appears to have been aware that Councilmembers met with the CFO
concerning a pending contract subject to Council review and
approval.  Further, in concluding that the "communications at
issue were . . . attempts to 'cajole' . . . Gandhi," Payne, 279
F.R.D. at 7, the magistrate judge did not violate the edict to
"examine . . . legislators' acts 'stripped of all considerations
of intent and motive.'" Youngblood v. DeWeese, 352 F.3d 836,
840-41 (3rd Cir. 2003) (quoting Bogan v. Scott-Harris, 523 U.S.
44, 55 (1998)).  She merely tracked the analytical framework
followed in precedent in this district.  See Williams, 597 F.
Supp. 2d at 117; Jewish War Veterans, 506 F. Supp. 2d at 58.

-22-

legislators "[acted] outside their legislative duties not simply
because they were dealing with agencies apart from [the
legislature], but because the activities did not concern any
business of the legislature").  Because these communications
concerning Payne's demotion and termination did not serve the
purpose of gathering information to guide a legislative vote, the
movants' objections to the magistrate judge's Speech or Debate
Clause analysis therefore will be overruled as to communications
concerning Payne's demotion and termination.[10]   The objections
will be sustained as to the movants' communications concerning
their review and approval of the lottery contract.

II.  MAYOR'S ADDITIONAL OBJECTIONS

The Mayor argues that the information Payne seeks from him
can be obtained from alternate sources, and that providing
deposition testimony poses an undue burden.  (D.C.'s Obj'ns at
7.)  Payne counters that only Gray can address the substance of
private conversations he had with Gandhi as to Payne, what
"personal problem" Gray had with Payne, and why Gray asked Payne
on April 9, 2008 whether Payne was "going to bring that [lottery
contract]" up again.  (Pl.'s Consolidated Opp'n at 15-16.)  Payne
also asserts that "extraordinary circumstances obviate any burden
on Mayor Gray."  (Id. at 16.)

---

[10] As Payne made no showing of such communications by Evans,
Evans's subpoena will be quashed.

-23-

A.  <u>Alternate sources</u>

"[H]igh ranking government officials are generally not subject to depositions unless they have *some* personal knowledge about the matter and the party seeking the deposition makes a showing that the information cannot be obtained elsewhere." Alexander v. FBI, 186 F.R.D. 1, 4 (D.D.C. 1998) (emphasis in original).  The magistrate judge did not err in finding that Gray would have personal knowledge of his own conversations with Gandhi.  Payne, 279 F.R.D. at 7.  Gandhi establishes that he had one-on-one conversations with Gray but cannot remember what was said.  (Pl.'s Consolidated Opp'n at 15.)  Although Gray claims no recollection of such private conversations, that cannot bar Payne from deposing the only other party to the conversations with Gandhi and attempting to refresh Gray's memory of the conversations that Gandhi says happened.  And, only Gray can explain what alleged "personal problem," if any, he had with Payne.  Payne has met his burden to show that some of the information he seeks cannot be obtained elsewhere.  This portion of the Mayor's objection therefore will be overruled in part.  However, Payne has failed to demonstrate that Gray's question concerning the lottery contract exceeded the legislative sphere, and that no other individual can attest to Gray's comments during such larger meetings as Gray's May 5, 2008 meeting with Gandhi

and others, and his meeting with W2I. (Payne Aff. ¶¶ 10, 12.)
This portion of the Mayor's objection will be sustained.

      B.   <u>Undue burden</u>

     The magistrate judge also did not err in finding that
requiring the Mayor to sit for a deposition is not an
"'unreasonable[ ] or oppressi[ve]' request" in light of all the
evidence in the case. <u>Flanagan</u>, 231 F.R.D. at 102 (quoting
<u>Northrop Corp. v. McDonnell Douglas Corp.</u>, 751 F.2d 395, 403
(D.C. Cir. 1984)) (alteration in original); <u>see also</u> <u>Clinton v.
Jones</u>, 520 U.S. 681, 704-05 (1997).

> Whether a subpoena subjects a witness to
> undue burden within the meaning of Rule
> 45(c)(3)(A)(iv) usually raises a question of
> the reasonableness of the subpoena. The
> determination of a subpoena's reasonableness
> requires a court to balance the interests
> served by demanding compliance with the
> subpoena against the interests furthered by
> quashing it; this process of weighing a
> subpoena's benefits and burdens calls upon
> the trial court to consider whether the
> information is necessary and whether it is
> available from any other source. It
> obviously is a highly case specific inquiry
> and entails an exercise of judicial
> discretion.

<u>Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas</u>, 262
F.R.D. 293, 299-300 (S.D.N.Y. 2009) (quoting 9A Charles Alan
Wright & Arthur R. Miller, Federal Practice and Procedure
§ 2463.1 (3d ed. 2008)). On the one hand, the benefits of the
subpoena include clarifying -- or correcting -- Jacobs's
characterization of Gray's concerns with Payne and providing

-25-

Payne his sole remaining opportunity to discover what if anything Gray said about Payne in the private conversation with the CFO. Both benefits may be important to Payne's claim for wrongful termination.  On the other hand, neither D.C.'s objections nor the Mayor's declaration details what burden a deposition deliberately limited in time and scope would impose upon Gray. Compare Clinton, 520 U.S. at 704 ("Sitting presidents have responded to court orders to provide testimony and other information with sufficient frequency that such interactions between the Judicial and Executive Branches can scarcely be thought a novelty.").  The magistrate judge's order reduced by half the length of the deposition from the presumptive seven hours (see Fed. R. Civ. P. 30(d)(1); LCvR 26(b)(2)(A)), to three and one-half hours, and this opinion will restrict the scope of the questioning to communications about Payne's demotion and termination.  Since the articulated benefits outweigh the unarticulated burdens, Gray must comply with the subpoena as modified.

### CONCLUSION AND ORDER

Because the Mayor and Councilmember Graham have not met their heavy burden of demonstrating that Payne's subpoenas violate Rule 45, they must provide certain requested deposition testimony.  It is hereby

ORDERED that D.C.'s and the Councilmembers' objections [45, 46] to the magistrate judge's ruling be, and hereby are, OVERRULED IN PART and SUSTAINED IN PART.  The objections to the magistrate judge's analysis -- or lack thereof -- of the Home Rule Act, legislative motive, and undue burden are overruled. Payne may depose Councilmember Graham and Mayor Gray as to communications each had with the CFO relating to Payne's demotion and termination.  D.C.'s objection to requiring the Mayor to provide deposition testimony as to his private conversation with Gandhi and any personal issues he had with Payne between April of 2008 and January of 2009 likewise is overruled.  However, the objections to any deposition inquiry into the then-Councilmembers' review of the lottery contract, and Gray's April 9, 2008 comment to Payne, are sustained, and the subpoena to Councilmember Evans is quashed.  It is further

ORDERED that the Councilmembers' Second Motion [78] to Quash be, and hereby is, DENIED as moot.  It is further

ORDERED that Payne's motion and sealed motion [83, 90] to supplement the record with additional new evidence that was not first presented to the magistrate judge be, and hereby are, DENIED.  It is further

ORDERED that Payne's unopposed motion [94] for a status hearing to set a pre-trial schedule be, and hereby is, DENIED as premature since discovery has not yet closed.  The parties shall

-27-

confer and file a joint status report and proposed order within

thirty days after Payne finishes taking the Councilmember's and

Mayor's depositions.

    SIGNED this 14th day of May, 2012.


                              _____/s/_____
                              RICHARD W. ROBERTS
                              United States District Judge